**UNITED STATES v. RUSSELL & TUCK-ER et al.**

No. 8445.

Circuit Court of Appeals, Fifth Circuit.

March 22, 1938.

Tom De Wolfe, Sp. Asst. to Atty. Gen., J. J. Greenleaf, Sp. Atty., Department of Justice, of Richmond, Ky., and Clyde O. Eastus, U. S. Atty., of Fort Worth, Tex.

R. B. Caldwell, of Kansas City, Mo., Dayton Moses and Hugh B. Smith, both of Fort Worth, Tex., and A. J. Lewis, of San Antonio, Tex., for appellees.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

In 1918 and 1922 the United States through the Bureau of Animal Industry were, by way of regulating interstate commerce, prohibiting the movement of cattle from fever tick infested points in Texas to other states, unless inspected and treated as required by regulations. Texas cattle carrying ticks were themselves immune to the splenetic fever caused or transmitted by the bite of ticks, but nonimmune cattle in tick free territory to whom ticks were imparted would within 30 days contract fever and many would die. The pastures in which ticky cattle run become infested with ticks, though the tick can crawl only a few feet. The accepted way of eradicating the ticks from cattle was to immerse the cattle in a solution of arsenic of proper strength, repeating the dipping after an interval of 7 to 12 days. A pasture can be cleaned of them only by dipping the cattle till all ticks are collected by them and killed. The cleansing of pastures and of local cattle was the work of state authorities, the Bureau co-operating. The cleansing of cattle for interstate shipment was supervised by the Bureau, as was the

cleansing of cars to carry them, but the actual work was done by the shippers as respects the cattle and the carriers as respects the cars. The carrier could not move cattle to another state, unless they were certified by Bureau inspectors either to be free of symptoms of splenetic fever or else had been found infected but had been treated by dippings specified in the certificate. The certificate accompanied the cattle to destination, but was finally retained by the carrier. This was all set forth in great detail by regulations of the Bureau.

In April and May of 1918 and again in 1922 several droves of cattle were treated at five different points in Texas for shipment to Oklahoma to be there grazed and fattened for marketing in the summer and fall. A few weeks later splenetic fever developed in three pastures in Oklahoma, previously tick free, and nonimmune cattle died, ticks being found on them; the pastures were quarantined by the state authorities, and a long process of dipping the cattle in them followed, which resulted in the death of some cattle, in the deterioration of others, in the loss of the year's market on most, and in expense and loss in carrying the rest over to the next year. On some of the shipments of cattle ticks were discovered on arrival by state inspectors, and the cattle were required to be reshipped to Oklahoma City for redipping, with an expense for carrying and feeding them there, and subsequent loss in flesh and market. Claims by the owners of cattle affected were urged in Congress, and special acts were passed in 1934 authorizing suit upon them in the federal courts. Under an Act approved May 9, 1934, 48 Stats. 1350, ten claimants joined in the present suit, and recovered judgment for their several damages as claimed. The United States appeals, contending that the negligences alleged were in no case proven, and that some of the damages claimed are remote and speculative and not recoverable.

■ The quarantine service of the Bureau was a purely governmental activity, in the nature of an exertion of police power respecting interstate commerce. Private injury because if it, or because it was not well done, would not ordinarily involve any liability on the part of the government, and of course sovereign immunity against suit would also prevent a recovery of damages. Congress, however, authorized the payment of some similar claims in Kansas. It did not authorize the payment of the claims before us, but by the special act above referred to waived expressly the immunity of the United States from suit and the bar of limitations, and authorized these claimants in a single petition to enter suit "for the amount alleged to be due to said claimants from the United States by reason of the alleged neglect and alleged wrongdoing of the officials and inspectors of the United States Bureau of Animal Industry in the dipping of tick infested cattle." The court was given jurisdiction to enter judgment "for the amount of such damages and costs, if any, as shall be found due from the United States to the said claimants by reason of the alleged negligence and erroneous certification, upon the same principles and under the same measure of liability as in like cases between private parties." It is plain that Congress did not acknowledge liability and leave only the fixing of damages for the court. It is also plain that the ordinary principle of nonliability of governments for police activities is not to apply. A liability for alleged neglect and wrongdoing of the officials and inspectors of the Bureau in dipping of the cattle, and for their negligence and erroneous certification is to be investigated, and determined on the "same principles and under the same measure of liability as in like cases between private parties." There are no cases between private parties precisely like these. The nearest analogy that occurs to us is the duty of one who undertakes a matter requiring expertness to bring reasonable skill and knowledge to his task according to the then state of the art, and to execute it with ordinary care, but involves no guaranty of the results. Such is the duty of a medical practitioner on man or beast.[1] The correlative duty of the patient is to obey instructions, act with ordinary care, and himself be free of contributory negligence.

---

[1] See 30 Cyc. p. 1570, 1573, 1579. Note 37 L.R.A. 830. Akridge v. Noble, 114 Ga. 949, 41 S.E. 78; Pike v. Honsinger, 155 N.Y. 201, 49 N.E. 760, 63 Am.St. Rep. 655; State v. Housekeeper, 70 Md. 162, 16 A. 382, 2 L.R.A. 587, 14 Am. St.Rep. 340, are cases of physicians and surgeons. Barney v. Pinkham, 29 Neb. 350, 45 N.W. 694, 26 Am.St.Rep. 389, is a case of a veterinary. National Savings Bank v. Ward, 100 U.S. 195, 25 L.Ed. 621, deals with the similar professional obligation of an attorney at law.

We are in this record presented with no standard of skill and knowledge in the tick eradication art in 1918 and 1922 superior to or different from the regulations of the Bureau. If they were duly followed, there would be no room for a charge of negligence. Operations under them had been remarkably successful, but the regulations undertook and the law imposes no guaranty of success in every case. The pleading in the suit recognizes this and as to each claim charges specific negligence in that the arsenical solution used was not of proper strength to kill the ticks, was not tested as required by the regulations, and the steers were not dipped in a proper manner; and in addition that there were other negligences not known to petitioner whereby the ticks were not removed as they would have been had proper care been taken. These allegations were flatly denied by the answer. The resulting issues are material to the asserted liability.

The burden was on the claimants to prove their case. Georgia Northern Ry. Co. v. Ingram, 114 Ga. 639, 40 S.E. 708; State v. Housekeeper, 70 Md. 162, 16 A. 382, 2 L.R.A. 587, 14 Am.St.Rep. 340; Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 920. Unless rebutted, the presumption holds, as respects public officials like these, that they did their duty. There is not a word of evidence of what happened to any of the cattle at any of the dipping points in Texas, except that one owner testified as to his cattle: "The cattle were dipped several times at Fowlerton, he always taking them there. The inspector fixed the vat and when he said he was ready witness and his hands would run the cattle in; that he depended on the Government to clean his cattle of ticks." Another owner said: "An experienced cattleman can tell whether a steer has fever ticks as well as a government inspector can, but none of the Russell & Tucker people inspected these cattle either in Fort Worth or Oklahoma. Witness was not required to do it and did not feel it was necessary because he thought they were properly dipped." Still another said: "Cattle coming from ticky territory, even though they had been dipped, always carried danger of subsequent development of ticks, which danger however was so slight that the regulations, etc., were supposed to take care of it to such an extent that he and others did not take that danger into consideration very much in handling cattle." There is testimony as to one drove at one dipping point that some of the cattle had their sides burned by too strong a dip. With this exception there is no direct evidence at all that the inspectors did not do all they should.

The circumstantial evidence which is mainly relied on is the conceded fact that in three pastures in Oklahoma in which Texas cattle were put ticks developed a few weeks thereafter. The argument is that there was no reasonable way for the ticks to have come there except on these Texas cattle, and they could not have thus come if the cattle had all been properly dipped in Texas. The first inference is allowable. The second we do not think will hold. It is an application of the res ipsa loquitur doctrine, stated in San Juan Light & Transit Co. v. Requena, 224 U.S. 89, 32 S.Ct. 399, 56 L.Ed. 680, and Blanton v. Great A. & P. Tea Co., 5 Cir., 61 F.2d 427. Its weakness here lies in the fact that the Texas cattle and their ticks were not in the exclusive control of the Bureau inspectors from the time of dipping till the ticks appeared, nor is it certain that careful dipping will unfailingly kill them all. The cattlemen and their agents had the care and feeding of the cattle at all times. The carriers transported them to Oklahoma, perhaps unloading them for feed and rest on the way. The owners had charge of them in Oklahoma. The dipping and car cleaning may have been carefully done and yet the cattle may have picked up ticks elsewhere. Some steer may have been undipped through the fault of the cattlemen themselves, and not of the inspector. Even where, as in some of the shipments, the Oklahoma inspectors found ticks immediately on arrival there, this might be true. It does not appear why these latter ticks, if present at the point of shipment, were not then discovered if either cattlemen or inspectors had looked for them; nor is it apparent why the additional dipping in Oklahoma, if properly done, did any more damage than redipping at the point of shipment would, except for some additional transportation charges. The United States could hardly be held for the unreasonable or unskillful actions of the Oklahoma authorities.

One lot of cattle was in 1918 dipped in oil at the owner's request, and so certified. At that time the oil dip was practiced and believed to be effective. In 1919 its use was discontinued. This is no reason to hold that its use in 1918 by the owner's election was negligent

Much stress is laid on the reliance of all persons concerned on the Bureau's certificates. Erroneous certification is mentioned in the act as a ground of liability. The certificate is primarily an authorization to the carrier to transport the cattle. Since it is to accompany them to destination, it reasonably may be held intended to be acted on by the consignee in accepting them. A willfully or negligently false certificate, made to be acted on by a third person, may be a basis of liability for damages between private persons. Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275, 23 A.L.R. 1425. Contrast Nat'l Savings Bank v. Ward, 100 U.S. 195, 25 L.Ed. 621. But the evidence here fails to show such. The certificates themselves are not in evidence, and the stipulations and testimony about them as we understand them are that those issued for the dipped cattle all stated that they had been found ticky and had been dipped so many times in such and such a solution and were authorized to be transported. There is nothing represented about the cattle having been subsequently inspected and found tick free, or any statement about the result of the dipping. The consignee might judge of the probable results, or inspect for himself. There is no evidence of any error or inaccuracy in any certificate, and no liability is shown for mere erroneous certification.

We find it unnecessary at present to enquire whether all the items of damages claimed would be recoverable if a liability were established.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed.

HUTCHESON, Circuit Judge, dissenting in part.