## UNITED STATES v. PRICE et al.
### No. 8446.

Circuit Court of Appeals, Fifth Circuit.
March 22, 1938.

Rehearing Denied April 16, 1938.

Tom De Wolfe, Sp. Asst. to Atty. Gen., J. J. Greenleaf, Sp. Atty., Department of Justice, of Richmond, Ky., and Clyde O. Eastus, U. S. Atty., of Fort Worth, Tex.

H. M. Muse and R. E. Taylor, both of Wichita Falls, Tex., and E. B. Anderson and J. L. Vertrees, both of Waurika, Okl., for appellees.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

Appellees are: (1) Shippers and owners of Texas cattle transported from tick infested areas in Texas to clean areas in Oklahoma, after having been dipped under the supervision of, and certified for interstate shipment by, inspectors of the Bureau of Animal Industry of the United States Department of Agriculture; (2) owners of native, or clean, cattle and pastures in tick free areas, which were quarantined by Oklahoma authorities as the result of the shipping in of the aforesaid Texas cattle.

They brought this suit for damages alleged to have been sustained as the result of the negligence of the Bureau in connection with the dipping and certification of the cattle for shipment.

The Act of Congress [1] authorizing the suit, provided:

"Henry Price * * * J. L. Kieth, W. T. Brummett; Price and Florence, a copartnership composed of Henry Price and Buster Florence * * * and estate of G. J. Kieth, their heirs, legal representatives, executors, administrators, and assigns, and statutes of limitations being waived, are hereby authorized to enter suit, * * * for the amount alleged to be due to said claimants from the United States by reason of the alleged neglect of the inspectors of the Bureau of Animal Industry, United States Department of Agriculture, in certifying as clean of splenetic fever ticks, cattle shipped from Texas to Oklahoma in the year 1919.

"Sec. 2. * * * and said court shall have jurisdiction to hear and determine said suit and to enter a judgment or decree for the amount of such damages and costs, if any, as shall be found due from the United States to the said claimants by reason of the alleged negligence and erroneous certification, upon the same principles and under the same measures of liability as in like cases between private parties, and the Government hereby waives its immunity from suit."

The negligence claimed was: (1) In permitting one dipping in Beaumont oil, instead of the repeated dipping, in an arsenical solution, as then required by the Department regulations; (2) in not inspecting the particular oil to determine its strength and efficacy as an eradicator of ticks; (3) in issuing certificates stating "that the cattle were clean and free of infection from splenetic or Texas fever," and authorizing their shipment to points in Oklahoma which were in clean territory, without a compliance with the requirements of the Bureau of Animal Industry relative to such shipments.

The defenses were: (1) That though the United States had, by the permissive act, waived its immunity from suit, it had done this and nothing more. It had not given or created a cause of action nor assumed a liability not already existing; and since the inspectors, in supervising the dipping of, and in inspecting the cattle for, shipment were merely performing a statutory duty for the benefit not of the plaintiff, or of any other particular persons, but of the whole people, neither the United States nor its inspectors would be liable to plaintiffs for the negligent performance of, or the failure to perform, that duty; (2) if the terms of the act could be construed as not only waiving immunity from suit, but as conferring a right of action for the negligence of the inspectors of the Bureau in certifying the cattle for shipment, to the same extent and upon the same principles as the inspectors, and the concerns they worked for, would have been liable if the certification for shipment had been undertaken as a private enterprise, and for the benefit not of the public generally, but of particular shippers, there could be no liability here, because the inspectors, in certifying the cattle after they had been dipped in oil were merely, as they were compelled to do, following a Department rule, which gave the shippers the option to elect dipping in oil, and shipment in 48 hours, if they preferred this method over the arsenical dip, and the longer delay before shipment; (3) the act limiting the inquiry to the alleged neglect of the inspectors in certifying the cattle as clean of splenetic fever, and the petition alleging that the inspectors negligently so certified, the claim must fail for

---

[1] Private Act No. 142, 73rd Congress, May 9, 1934, 48 Stats. 1352.

want of proof of the negligence alleged, for not only was there no evidence that the inspectors negligently certified the cattle as clean of splenetic fever, but it was affirmatively shown, that in strict accordance with the rules and practices of the Bureau, the cattle were not certified as clean at all but the certificates merely stated the fact of the dipping, the number of times and the solution in which they were dipped. Whatever, therefore, might have been said under a differently worded statute with regard to whether the use of Beaumont oil and the certificate which followed the use was negligence, plaintiffs cannot make that claim here as a basis for recovery, for the act which alone authorizes their suit limits their recovery to the alleged negligence of the inspectors of the Bureau of Animal Industry "in certifying as clean of splenetic fever ticks cattle shipped from Texas to Oklahoma in the year 1919"; (4) finally, the limitations in its terms disregarded, and the act construed as imposing on the United States the same liability for negligence private concerns would have been under if they had, in the interest and for the benefit of the particular shippers, undertaken the supervision of the dipping, and the certification of the cattle for shipment, the record is completely wanting in proof that either dipping or certification was attended with, or was the result of, negligence.

No evidence whatever was offered as to the nature and contents of the particular dip, except that it was Beaumont, or crude oil furnished by the shipper. Plaintiffs offered Dr. Grafke, as a witness. He had worked for the Bureau of Animal Industry 20 years, from 1907 to 1927. From 1914 to 1924 he was inspector of the Bureau in Texas, in charge of the field work for tick eradication, maintaining his office in Fort Worth, where he was supervisor in charge of the various branches of the Bureau at Fort Worth. Because he testified at length, and there was no contradiction of his testimony, it will be well to comprehensively summarize it.

At the time the cattle in question were dipped in crude oil at the Fort Worth yards, he had had long experience with such dipping, and neither he, nor any other agents of the Bureau, suspected or had reason to suspect, the results to be obtained from it. As far as he and his associates, and all the other officers of the Bureau knew, it was highly effective in killing ticks, and they were satisfied with it as a dip. He does not recall any ill results up to that time, like failure to kill ticks from the use of the oil dip, in the 7 or 8 years the government had been using it. At the time, therefore, that these cattle were dipped, there was a prevalent belief in which he shared, based upon the fact that crude oil had been for a long time effectively used in killing ticks, that it was effective as a dip.

The necessary and usual process as to cattle dipped in oil and held for 48 hours was for a government inspector to make a check inspection of the herd, to see, so far as he could from a casual inspection, that they were all dipped and apparently free from ticks. Such inspection could only be made for full grown ticks, for, after an oil dipping, the hair of the cattle would be matted, with an ugly, shiny appearance, making it impossible, for several days, to part it, and find any small ticks in the early stages of development. When an arsenical solution is used, it is easy to part the hair and make a careful inspection for small ticks 4 or 5 hours after dipping in it. In the many years in which oil dipping had been used and found effective, only one dipping in oil had been required, whereas arsenical dipping calls for more than one submerging.

From the time infested cattle went into a clean pasture, the period before the clean cattle would become infested, in April and May in the climate of Oklahoma, would be approximately 30 days. The particular cattle in question were handled at Fort Worth through a commission company, which, representing the shipper, bought and shipped the cattle for him, after dipping them in crude oil in the Fort Worth yards. The company, as owner's representative, knowing, that cattle dipped in crude oil would be held for 48 hours before shipment interstate, to give time for the ticks to drop off, and knowing, that the owner had an option to have either the arsenical or the oil dip, requested that the cattle be dipped in oil, and the dipping in oil was permitted because oil was at that time recognized and permitted as a proper dip, by the Bureau. The witness did not know whether the cattle in question were or were not clean when they left North Texas, but he knew they were dipped in oil, allowed to remain about 48 hours thereafter, and then permitted to be shipped. At that time the Bureau had discontinued the use of oil vats in the Fort Worth yards, but, under the regulations

then in effect, the owner had the choice between arsenic and oil, and the witness, as the government's representative, could not refuse the owner's request for permission to dip the cattle in oil. However, having previously notified the Bureau headquarters at Washington of the discontinuance of the oil vat at Fort Worth, he considered that he should have special approval or authority before complying with the request, and he did receive a telegram directing him to permit the owner to dip the cattle in oil. He does not know where the oil came from. He knows it was supplied by the shipper through the commission company which provided the dip and a crew for putting the cattle through the vat. A government inspector was present to, and did, supervise the cattle going through it to see that every animal was thoroughly submerged. The inspector saw to it that there was sufficient depth to immerse the steers, the commission company employees drove the steers into the vat, and the government inspector stayed there and saw that they were properly dipped. Because the owner, through the commission company, had supplied the oil which was used, and the United States inspector had no means of testing it, the inspector simply had to rely upon the integrity of the owner's agent to supply the required sort of oil. If the shipper or his agent had chosen to investigate the oil he could have done so, and, if he had had any reason to believe it would not be effective, he had the right to call the inspector's attention to the fact. If he had done so, the inspector would have made no objection to any effort on the part of the owner to see that proper oil was used.

When arsenic was used, the commission company would provide the dip and see that water was put into the vat. The inspector would test it, and by his instruments he could accurately determine its specific gravity. The government regulations and Bureau inspections provided for no specific gravity or other field test of oil used in dipping.

The witness first became skeptical about the efficiency of crude oil dipping in the spring of 1919, after which oil dipping was discontinued unless the owner would agree to have the cattle held for about 10 days for inspection, or until they were dry enough to tell whether they had ticks on them. He testified, too, that the best of inspectors have occasionally made a few mistakes, and that, considering the number of cattle dipped, the percentage of efficiency of all cattle dipping in Texas in the years covered by these cases was very high.

This is all the testimony there was as to the dipping. Though the inspectors who had supervised the actual dipping were there present in court, neither plaintiffs nor defendant called them to testify.

As to the certificates, the proof established that the cattle were not certified to be clean or free from fever. Certificates so certifying were used only for cattle which came from clean territory, and did not have to be dipped. When cattle came from quarantined territory, as these did, the certificate merely showed that they had been dipped, and gave the preparation or solution in which, and the number of times they had been dipped. That form was used in this case.

No one testified that the cattle were not properly dipped, that the solution used was not sufficiently strong, that when they were certified for shipment they were still tick infested. The whole claim of plaintiffs was based upon the fact that after nearly 3 months from the time of their arrival in Oklahoma, evidence of some tick infestation was found, and, as the result of that finding, the pastures were quarantined by the Oklahoma authorities, some of the clean cattle became infected and died, and the other damage sued for, loss of weight from redipping, loss of the 1918 market, and charges for feeding and carrying over, followed.

It is thus apparent that plaintiffs could not and did not rely for their recovery below, upon evidence that the inspectors had given a clean certificate for ticky cattle, nor upon any direct evidence that the inspectors had neglected, or negligently performed, any duty incumbent upon them. They were compelled to, they did rely entirely upon an inference of negligence on the part of the inspectors, drawn entirely from the circumstance that ticks were found, some months later, on cattle in which were supposed to be clean Oklahoma pastures. In short, plaintiffs were driven by the evidence, to invoke, and they did invoke, and depend as their sole reliance upon, inference, res ipsa loquitur.

They did this by postulating a series of propositions, adequate, if supported by the facts, to sustain the inference the recovery in their case demands. These propositions are: (1) That the United States, through the Bureau, held out to them, as

shippers into and owners of cattle in clean territory, that it had devised and placed in operation a system of tick eradication measures, including dipping and certification for shipment, which, if carried out with due care by the inspectors, would insure that ticky cattle would not be shipped interstate until made tick free; (2) that as a part of this holding out, the government, through the Bureau, had, in giving shippers the election to dip in oil or in arsenic before certification for shipment, held out to shippers generally and to plaintiffs in particular, and they could rely upon it, that the prescribed dipping in either oil or arsenic was absolutely effective to eradicate all ticks, and that certification for shipment was a guarantee that the cattle were tick free; (3) that the shipper plaintiffs relied absolutely on this holding out in electing oil instead of arsenic, and thereafter shipping their cattle, and would not have so elected and shipped but for that reliance; (4) that it now appears, indeed, is in effect admitted, both from the fact that ticks were found in supposedly clean Oklahoma pastures, to which their cattle had been taken after they had been dipped in oil, and that the Bureau shortly afterwards did away with the permission for use of oil and shipment after 48 hours, because of the impossibility, within that time, of making an adequate inspection, that permitting their dipping in oil and certifying them for shipment in 48 hours thereafter was negligence. The District Judge took plaintiffs' view of the matter, and, reasoning as they did, gave judgment for them.

Appellant, insisting upon all of its defenses, urges upon us that there was fundamental error in the judgment.

The writer differs with his associates both as to the scope of the act in suit, and as to its effect in creating a cause of action. They think, as shown by their opinions in the companion cases brought by Porter and Biffle, and Russell and Tucker Cases, U. S. v. Porter and Biffle, 5 Cir., 95 F.2d 694, U. S. v. Russell and Tucker, 5 Cir., 95 F. 2d 684, this day filed that the acts in suit confer a right of action, and that the right of action conferred is the same in each case. I do not think so, and because I think the questions are important, I shall set out, as the personal views of the writer, the reasons which cause me not to do so.

I think it may not be doubted that if the Permissive Act which authorized the suit, did no more than waive governmental immunity, did not create a cause of action, that is, confer a right on plaintiffs to recover, if they could prove negligence, plaintiffs have not shown, they cannot show, such right. If they have shown any neglect, they have shown it only in regard to the performance of a statutory duty imposed exclusively for the protection of the interests of the state as such, and to secure to individuals the enjoyment of rights and privileges to which they are entitled, not as individuals, but only as members of the public. Negligence in the performance of such duties is not actionable. It does not form the basis of civil liability. Torts, Restatement, § 288.

I think, too, if the act confers an action for such neglect, that if plaintiffs are confined within its terms, that is, to proof of neglect on the part of the inspectors, they still have not made out a case. For the inspectors did not certify at all that the cattle were clean, or free from ticks; they merely, in accordance with the Bureau regulations, and practices for handling ticky cattle, certified that the cattle were ticky, that they had been dipped, and that they could be moved interstate. Further, if the precise terms of the act are to control, and plaintiffs cannot complain of the neglect of the Bureau as such, and of its officials, but only of the neglect of the inspectors in certifying the cattle, plaintiffs must fail I think, for under plaintiffs' own theory the inspectors were guilty of no neglect whatever. They merely followed, as they had to do, what plaintiffs claim are negligent regulations and practices of the Bureau, in permitting dipping in oil and shipment within 48 hours thereafter, upon request of the owners.

Appellees argue that it is to unreasonably construe the act to construe it as merely waiving immunity, or as, if conferring a right of action, confining it to the neglect of the inspectors alone in the particulars set out in the act. They call to our attention that the act for the relief of Russell and Tucker, Private No. 137, 48 Stat. 1350, passed on the same day with theirs, upon which act, instead of their own, Private No. 142, 48 Stat. 1352, plaintiffs in this suit declared authorized those persons to enter suit for "the amount alleged to be due by reason of the alleged negligence and alleged wrongdoing of the officials and inspectors of the United States Bureau of Animal Industry in the dipping of tick infested cattle in Texas and Oklahoma." They point too,

to the report of the House Committee on Claims, stating that "the purpose of the bill [Private Act No. 142] is to permit the parties named to enter suit for damages, by reason of the alleged neglect and wrongdoing of officials and inspectors of the United States Bureau of Animal Industry, in dipping tick infested cattle in Texas and Oklahoma." In reply, appellant insists: That it is not to the committee report, but to the act itself, that the court must look for its purpose and effect; but if the report can be looked to, it there appears that: "the only purpose of this bill is to permit the claimants to bring suit in the Federal court for their alleged damages. No right is taken from the Government, and it can set up all proper and legal defenses against these claims. If these claimants are damaged as alleged, by the negligence of government officials, the Committee believes that they should have the right to their day in court," and that the bill authorizing these plaintiffs to sue was amended, "so as to make clear that if the claimants have suffered any wrong at the hands of the United States, it would be by reason of the certification of the cattle as clean, when, in fact, they were not, and not by reason of anything which occurred in the dipping."

I am of the opinion that the scope and effect of the plain terms of the act may not be enlarged by reference to the report. They must be construed in accordance with their reasonable and ordinary meaning. So construed, they operate, I think, not to confer a right or cause of action upon plaintiffs, but merely to permit plaintiffs to sue the United States, and to recover in such suit, if, but only if, they could recover in a suit against private persons performing such statutory duty, as for instance, against the inspectors themselves.

I think a reading of the act as a whole, and of each particular term in it, compels this conclusion. As a whole, the act provides a waiver of the statutes of limitation, authorizes the entry of suit, and confers jurisdiction upon the District Court for the Northern District of Texas, to determine the suit and enter a judgment or decree for the amount of such damages and costs, if any "upon the same principles and under the same measures of liability as in like cases between private parties, and the Government hereby waives its immunity from suit." If more had been intended, than a waiver of immunity and consent to suit, the act would not have confined plaintiffs' recovery to

like cases between private parties. It would have used entirely different terms to fix the basis of recovery. It would have declared that the United States assumed liability, and agreed to stand in damages, for the neglect of the inspectors, if any, in certifying the cattle as tick free; thus not only waiving its immunity, but conferring a right of action as to conduct, where none existed before.

Thus construed, plaintiffs' case under the act, I think, fails, because the neglect if any, of the inspectors in performing the statutory duty imposed upon them, cannot form the basis of civil liability, either of themselves, or of those for whom they were acting. Torts, Restatement, supra.

I think plaintiffs' suit fails, too, if the statute could be construed both as authorizing suit and as conferring a right, if the inspectors were found negligent in the respects the act deals with, for the proof fails to show any neglect on their part in certifying the cattle for shipment. It shows, on the contrary, that they certified them in exact accordance with the rules and practices then in force, governing the certification of cattle, which, at the owner's option and request, had been dipped in oil. If, as plaintiffs claim, dipping in oil and shipment in 48 hours was negligence, it was the negligence of the Bureau officials, and not of the inspectors, and therefore not within the act.

But if I treat plaintiffs' suit as plaintiffs and my associates do, as conferring a right upon them to sue and recover for damages caused to them "by reason of the alleged negligence and alleged wrongdoing of the officials and inspectors of the Bureau in the dipping and erroneous certification of tick infested cattle" I should reach the same conclusion that my associates do, that plaintiffs have not made out a case. For, as has been seen, their case depends upon a series of assumptions as to a holding out by the Bureau, and a reliance by plaintiffs upon that holding out, while the facts in evidence, and those of which we take judicial knowledge, do not bear these assumptions out.

The laborious, thoughtful, and remarkably successful joint efforts of state and federal authorities to discover, deal with, and stamp out the causes of "Texas, splenetic, Spanish, or Southern" fever, and particularly their joint efforts to control the movement of cattle from infected into clean

areas, make a long and fascinating history.[2] Nothing in that history gives countenance to the assumptions on which plaintiffs' case depends, that in 1919, when the cattle in question were dipped in oil and certified for shipment, it was being held out, or ever had been held out, by the Bureau, that one or any particular number of dippings were absolutely and always completely successful in eradicating all ticks, and that shippers could take a dipping and certification of cattle for shipment as a guarantee that they were clean. The watchword of the Bureau, as well as that of the states with which the Bureau worked in concert, was that eternal vigilance was the price of safety; that not one, but as many inspections as were necessary to ascertain, and as many dippings as were necessary to remove, infection, must be had. We judicially know, the record in this case shows, that the duties of the Bureau as to these cattle were undertaken, carried out, and performed, not in the interest of private parties, but as a public duty, under co-operative agreements with the state authorities of Texas and Oklahoma, respectively.

Plaintiffs' first assumption, then, falls. This, to restate it, was that the Bureau has taken complete and final charge of tick eradication, in the interest of particular cattle shippers, to the extent of holding out to them that the dipping, before cattle could be certified for interstate shipment, was in their interest, and was attended with a complete and absolute guarantee as to them, that,

if done as required, no guilty tick could escape, the cattle so dipped would be completely clean, and no further precaution against their spreading infection need be taken.

Their second assumption is equally unfounded. This was that in 1919 there was something recondite or secret with regard to fever ticks or the manner of dealing with them to eradicate them and bring about clean cattle and clean pastures, something beyond the knowledge of, or at least unknown to, cattlemen, and they must therefore rely, and they did rely blindly, upon the Federal Bureau inspection as a guarantee of cleanliness.

It is perfectly clear that Beaumont, or crude oil, had been in use for dipping for years, and that its effects on cattle were simple, direct, and as well known to shippers as to inspectors. Particularly is it clear that the matted condition of the hair, and the inability to part it to search for small ticks after dipping in oil, and the necessity for an additional inspection after the hair of the cattle had sufficiently dried, as well as the necessity of keeping cattle from tick infested areas out of clean pastures and away from clean cattle, until time and inspection had made this sure, were as well known to cattle men and to the Oklahoma state authorities, who, under their agreement with the Bureau, had copies of all certificates, and knew how and in what the cattle had been dipped, as they were to the Bureau inspectors.

[2] The legislative history is shown on the statute books of the Southern states and of those bordering on them. Perhaps the earliest of these is the act of the Kansas Legislature in 1881, c. 161, followed by the Kansas Act of March 25, 1884, Laws Kan.1884, Sp.Sess., c. 2, creating a Livestock Sanitary Commission. The history of the federal legislation is shown in its statutes. The first of these statutes, enacted May 29, 1884, 7 U.S.C.A. § 391, just after Kansas had provided for its Livestock Sanitary Commission, created a Bureau of Animal Industry. The duties of the Bureau were "to investigate and report upon the condition of domestic animals, * * * and also to inquire into and report the causes of contagious, infectious, and communicable diseases, * * * and the means for the prevention and cure of the same, and to collect such information on these subjects as shall be valuable to the agricultural and commercial interests of the country." The work of the Bureau was begun,

it has continued, in full co-operation with the states. Section 3 of the act of 1884, 21 U.S.C.A. § 114 provided that it should be the duty of the Commission to prepare such rules and regulations as it would deem necessary for the speedy suppression and extirpation of disease, and to certify such rules to the executive of each state and territory and invite their co-operation.

The judicial history of this co-operation, of which the reports of the decisions of the United States courts are full, is well enough shown in Missouri, Kansas & Texas R. R. v. Haber, 169 U. S. 613, 18 S.Ct. 488, 42 L.Ed. 878; Reid v. Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108; Asbell v. Kansas, 209 U.S. 251, 28 S.Ct. 485, 52 L.Ed. 778, 14 Ann. Cas. 1101; Thornton v. U. S., 271 U.S. 414, 46 S.Ct. 585, 70 L.Ed. 1013, and Mintz v. Baldwin, 289 U.S. 346, 53 S.Ct. 611, 77 L.Ed. 1245. The last named does not deal with splenetic fever, but it points up and reconciles apparent conflicts in the scope of state and federal power.

694

The appeal of Porter and Biffle, in which the governing statute and the grounds of the claim are the same as in this case, and the appeal of Russell and Tucker, under a different statute and different facts as to the dip used, and the time when and conditions under which thereafter infestation was discovered, have been somewhat differently dealt with in the opinions of my associates.

I do not agree with them that either statute conferred a right of action for negligence. I do agree with them, though, that the proof completely fails to show negligence. Without, therefore, extending this opinion further, I conclude it by saying that for the reasons stated in those opinions and in this, if the statute gave plaintiffs a cause of action, they have not proved one; that, in short, as completely as they failed upon their other theories, plaintiffs have failed upon the res ipsa loquitur theory of their case, that no reasonable inference can be drawn from the circumstances in evidence, except an inference that the inspectors were negligent.

The judgment is reversed, and the cause remanded for further and not inconsistent proceedings.

Reversed and remanded.

SIBLEY, Circuit Judge (concurring).

I concur in the result. I think however that both Private Acts mentioned are to be construed as giving a right of action against the United States if there was negligence in the respects mentioned in the acts.