**RUSSELL & TUCKER et al. v.
UNITED STATES.**

No. 209.

District Court, N. D. Texas, Dallas Division.

Feb. 14, 1940.

74

Hampden Spiller and Dayton Moses, both of Fort Worth, Tex., McCune, Caldwell & Downing, of Kansas City, Mo., Walker, Smith & Shannon, of Fort Worth, Tex., and H. N. Noble, of Kansas City, Mo., for plaintiffs.

Clyde O. Eastus, U. S. Atty., and Frank Potter, Asst. U. S. Atty., both of Fort Worth, Tex., and Tom DeWolfe and R. Ragland, Asst. Attys. Gen., for defendant.

ATWELL, District Judge.

Those who are included in this case, and whose claims aggregate many thousands of dollars, are: E. L. Russell, S. C. Tucker, Barroum, Tucker and O'Connor, Russell, Wilson, Rutledge, Brown and Nichols, J. M. Dobie, Rocky Reagan, Drummond, and Dick Colson.

Some of the dippings were at Fowlerton and Three Rivers, and then at Fort Worth. The inspections and dippings at Fowlerton and Three Rivers were of cattle that came to those points for shipment from an area of systematic tick eradication; that is, a territory where there had been at least two dippings under the inspection of the owners.

The case was filed in the Fort Worth division in 1935. It did not come under my observation until the fall of 1939, and at the setting of the docket on December 9th, 1939, it was assigned for February 5th, 1940, that date being satisfactory to all parties. It has been in the Circuit Court of Appeals, where, in 95 F.2d 684, a decision for the plaintiffs was reversed. That trial was had in the Fort Worth division before another judge. In the opinion, which binds this court, it was determined, by a divided court, that the act of Congress, Act May 9, 1934, 48 Stat. 1350, which authorized the suing of the United States for the alleged neglect and wrong doing of the officials and inspectors of the United States Bureau of Animal Industry, in the shipping of tick infested cattle, gave a right of action to the plaintiffs. But that act did not acknowledge liability. In the ascertainment of whether there is liability the ordinary principle of non-liability of government for police activities is not to apply.

Ordinarily, the sovereignty cannot be made to respond for the slackened performance of duty by its officials, if they have shown neglect in regard to the performance of a statutory duty imposed exclusively "for the protection of the interests of the state as such, and to secure the individuals the enjoyment of rights and privileges to which they are entitled, not as individuals, but only as members of the public. Negligence in the performance of such duties is not actionable. It does not form the basis of civil liability."

That is substantially, with some phrases identical, the dissent of Judge Hutcheson, rendered against the thought

that the government could be held liable for the negligence of its officers. United States v. Price, 95 F.2d 687, 691. That dissent, however, cannot be the rule of action in this court, for this case. This court must try the case in accordance with the direction of the majority opinion. Therefore, the bases and rules for the ascertainment of the right on the differences raised in this pleading are the same principles and the same measure of liability as in like cases between private parties.

█ The testimony shows that the plaintiffs are sophisticated cattle men. It would hardly be safe to permit one's knowledge of a fact to be hid behind the warranty of another person. If, in truth, the owners of the cattle, or their responsible communicating agents, knew that there had been a faulty dipping, or inspection of any particular animal, they could not excuse the failure to communicate such knowledge to the officiating agent by saying that they relied upon him and his certificate. A man sees a steer going through, riding another steer, and he says that he does not believe that the riding steer was immersed, and yet, he says, "I thought the inspector knew his business and when he certified that he was immersed, that that would give me a right of action against his superior." Nor can the owner of cattle, who is anxious to speed them to market, drive them in unwieldy droves into the vat so that they ride one another through, and knowing that that is being done, afterward say that he thought the inspector knew his business and would not certify immersion, if such exposure had not, in reality, destroyed the tick.

However, without toying too much with generalities, let us view this case. It seems that there are different sorts of ticks. One sort makes fever—splenetic fever—against which society is warned. That tick hides on certain parts of the body of the steer. Officers are supposed to inspect the steers before they go through the vat, and after they shall have come through the vat. Those are the expert operations that the tick inspector is charged with performing, with ordinary care.

In these bulletins, it is not, "Absolutely free of ticks," but, "Apparently free of ticks." The government suggests that some of the ticks might have been hidden in south Texas. One witness said they might be hid by the droppings from the steer, and sometimes when the ticks were mating

there is a protection, or something thrown out, that might save them from the arsenical dip, and things of that sort. So that is the expert field in which we are operating, as to the inspectors, and ordinary care.

With reference to all the claims, we find a high cattle market, the highest this country had seen. It was during war-times. Tick infested cattle in the south part of Texas, and in the quarantine portion of Texas, were owned there by men who wanted to reap some of the high prices, and they desired quickly to get the cattle out, and they participated in this hurried rush to do so, with their own eyes open, as to what was done, if anything careless really happened.

When the Russell and Tucker cattle got to Fort Worth, the owners asked for one shipment of them to be immersed in oil, which was done, and a large quantity of oil was purchased for that purpose. The law gave the shipper that right.

█ While the testimony for the plaintiffs is not satisfactory as to any negligence, within the standards already roughly mentioned, neither is the testimony of the government entirely satisfactory, that it was properly done; however, the government stands with the presumption that its officers do act with care; that is the mantle that is thrown about them; some do not justify that presumption, I dare say, but the presumption is legal. Again, the lapse of many years makes definiteness difficult.

█ The dipping pens, whether at Fort Worth, or at Fowlerton and Three Rivers, were places where there were a number of pens. The larger of those pens was used for the congregation of the cattle as they arrived. Out of this large pen, or pens, cattle were moved into what is called a crowding pen, which was a lesser pen, holding some twenty or twenty-five cattle, or something in that neighborhood. In that crowding pen were men on horseback, and I think also men on foot, but certainly men on horseback, and they pushed or pressed the cattle out of the crowding pen through a chute, into the vat, which in Fowlerton, and Three Rivers, was approximately from twenty-four to twenty-eight feet long from tip to tip and from ten to twelve feet long in the swimming part, with an incline at either end, one for the entry and the other for the exit. The cattle, in being pushed from the crowding pen into the vat, could slide into the vat. Most of

them did so, but some of them jumped into the vat. After they had gone through the vat, which had a quantity of solution sufficient to immerse them as they went through, the cattle then emerged into what was called a draining pen, where such solution as was retained by them, after they emerged from the dipping vat, drained to the floor, which floor was connected with the dipping vat, so that that fluid ran back into the dipping vat. Some inspections took place in that pen—some in the crowding pen, some in the larger pens as they were congregated; some later, as they entered the car, or before they entered the car. They passed from the draining pens into a larger pen where they dried and were kept before they were loaded into the waiting train. The solution was properly tested.

At the Fowlerton and Three Rivers dippings and Fort Worth dippings, there were inspections, before immersion and after immersion, and if it transpired that an animal was not properly immersed as viewed by the inspector, or his helpers, as the case might be, under his instructions, they were prepared to, and did in some instances, place the solution out of a bucket, or a utensil, on that portion of the animal which was not immersed, which was usually its head. That also some of that solution from the utensils was placed on the head in the draining pens, and sometimes if by riding another steer, one got through without being properly immersed, which happened in a few instances, and if they thought that the placing of the water out of the bucket was not sufficient precaution, they drove the animal back through the vat again.

The authorized agents were present and viewed what took place.

Those cattle were shipped out in each instance after those operations, and certified, substantially as set out in the plaintiffs' petition, and in some of the instances when those cattle reached Oklahoma, they were again inspected and found to be free of ticks, and later, about July of the year of the arrival, which arrival was in April, they were quarantined because some ticks were found. Upon some of those shipments when they reached Oklahoma, they found a tick, or some ticks, and such shipment was quarantined and dipped there.

In such instances they merely did there what was done in Texas, if it was for a tick which was present in Texas.

The fences between Mr. Drummond's pasture and the pasture in which some of these cattle were placed, and which he claims infested his cattle, were insecure and unsubstantial.

There was a tick infestation in that section of Oklahoma in the year 1917, as evidenced by the finding of a few ticks upon practically both sides of this particular area, and from four to five, to six miles distant, perhaps one side ten miles distant.

Ticks may be carried upon cattle, or horses or mules, and when they are so carried they must be dropped and reinhabit an animal, not immune, and then drop again, and be taken up by a native animal, before they are poisonous, or fever infecting.

The method of inspection at Fowlerton and Three Rivers and Fort Worth, for that matter, especially at Fowlerton and Three Rivers, was known to the plaintiffs in each of those cases, but, not, of course, known to the claimants in Oklahoma.

There was a cooperation of the state cattle inspection forces and methods with the United States Bureau of Animal Industry. This cooperation had been in effect several years prior to the year 1918. In 1922 the movement of cattle from Texas infested counties became so heavy that it was necessary to augment the Bureau of Animal Industry forces, and several inspectors were chosen from the state forces. The choice was made of those who, after investigation, appeared to be reliable, efficient, and in every sense, capable.

Such officers were given a commission and paid a dollar a year by the national government, and they held both State and Federal commissions. Those inspectors served during the rush period of 1922 and were discharged in May of that year, after the season was over. Their release was for no reason of inefficiency.

The splenetic fever tick attaches itself to the tender portions and under portions of the neck, near the body, and between the legs, and on the rear of the animal. If the cattle were dirty from either dirt or droppings, sometimes such dirt or droppings, and the mating of the male and female tick, would protect them from destruction by the immersion in the arsenic solution. This fact was not known in 1918, nor 1922, but is a fact that has been discovered since.

The modern "scratching chute," for the inspection of the individual animals, was

not known, nor in use in the years 1918 and 1922, but is something that has come into use and knowledge since those years.

No such double-commission inspectors were used in the Fort Worth stockyards in the dipping of the Russell and Tucker cattle. Those cattle were dipped and inspected exclusively by United States inspectors. The cattle that were dipped and inspected at Three Rivers and Fowlerton in 1922 were dipped and inspected by double-commission inspectors after the preliminary inspections and dippings by the owners as heretofore found.

These conclusions on the facts preclude any thought of negligence on the part of the officials in either inspection or dipping, and judgment must go for the defendant.