## PRICE et al. v. UNITED STATES.
## PORTER BROS. & BIFFLE v. SAME.
### Nos. 210, 211.

District Court, N. D. Texas, Dallas Division.

Feb. 29, 1940.

Earl Pruet and A. W. Gilliland, both of Oklahoma City, Okl., for plaintiffs.

Tom DeWolfe and R. Ragland, Asst. Attys. Gen., for defendant.

ATWELL, District Judge.

These suits were filed in the Fort Worth Division of this District, in 1934. At the trial which occurred some time later, before a judge there, judgment was rendered for the plaintiffs. Upon appeal by the United States, the judgment was reversed. One of those reversals is shown at United States v. Price, 5 Cir., 95 F.2d 687, and the other at United States v. Porter Brothers & Biffle, 5 Cir., 95 F.2d 694.

The act of Congress authorizing the suit, and waiving immunity, in so far as the Price case is concerned, which was originally 210 here, applies to Henry Price, J. L. Kieth, W. T. Brummett, Price and Florence, a partnership composed of Henry Price and Buster Florence, and the estate of G. K. Kieth. The act provided that judgment should be rendered for such damages and costs, if any, as shall be found due from the United States to the said claimants by reason of the alleged negligence, and erroneous certification, upon the same principles and under the same measures of liability as in like cases between private parties.

The res ipsa loquitur doctrine was relied upon in this particular case. Judge Hutcheson differed from the majority of the court, they holding that the act conferred a right of action, and that the right so conferred is the same in each case. Judge Hutcheson did not think the act created a cause of action; he thought that the im-

position of a statutory duty exclusively for the protection of the interests of the state, and to secure to individuals the enjoyment of rights to which they are entitled, not as individuals, but only as members of the public, will not support an action, even though there be negligence in its performance. He also thought that there was no neglect shown on the part of the inspectors.

■ The language of the act was also adverted to, as well as the report of the committee which brought in the bill. It was stated that the scope and the effect of the plain terms of the act may not be enlarged by reference to the report. But the act must be construed by this court at this time as construed in that opinion by the majority of the court. That is, that the act confers the right upon the plaintiffs to sue and recover for damages caused to them, "By reason of the alleged negligence and alleged wrongdoing of the officials and inspectors of the Bureau in the dipping and erroneous certification of tick infested cattle." Act May 9, 1934, 48 Stat. 1352.

In cause No. 211, Porter Brothers & Biffle, which is now consolidated with 210 and which makes the new case of 211 consolidated, the statute is the same as in the Price case. It was filed at the same time in the Fort Worth division, and was later tried with a resulting judgment for the plaintiffs, which was reversed in 95 F.2d page 694, as stated, it centered and now centers around shipments made in 1919, as did the Price case, of cattle from Texas to Oklahoma. G. L. and J. L. Kieth shipped 180 steers from Fort Worth to Oklahoma, of which 172 had been shipped to Fort Worth from tick infested territory where there was a quarantine against splenetic fever which is produced and communicated by the Texas fever tick. The negligence alleged is that said cattle were permitted to be dipped in oil without testing the oil, and that a second dipping was not required, and that there was no inspection after such dipping. That the federal agents issued certificates stating that said cattle were properly dipped and inspected, when they knew that the regulations had not been complied with. That said cattle arrived in Oklahoma, and were placed in a pasture with 747 steers of Porter Brothers & Biffle, and that the ticks spread to the 747 steers and were discovered in July, 1919, and quarantine followed.

Another claim is Spradling & Porter Brothers, based on 238 steers which were mingled in the same pasture with the Kieth steers, and resultant damage is alleged.

The action is not one upon a contract, but is, in fact, an action ex delicto, predicated upon the negligence of federal agents. The government stripped itself of sovereignty and enters the court as an ordinary litigant, renouncing none of its legal defenses, except limitation, which is waived.

■ The Congress intended to give these claimants their day in court in order to determine whether their alleged damages were caused by negligence of federal agents and officials. In determining that, this court does so upon the same general principles of the law of torts applicable in similar cases between private parties.

These claims are in a substantial amount, aggregating several hundred thousand dollars.

The case reached this court in September, 1939, and was assigned for trial, at the time of the setting of the January docket, for February 5, 1940. On that date, and shortly thereafter, the present plaintiffs' attorneys advised the court that they had just come into the case and needed more time and the case was re-assigned for February 27, 1940, and the cases consolidated under 211 Civil.

We have been taking testimony since that date, with careful concentration, hearing and observation.

There are hazards in nearly every business. The boll weevil pesters the cotton crop, the tobacco worm destroys the tobacco crop, various sorts of insects attack orchards, drouth and floods imperil wheat and corn, fires and sickness impede other forms of business, but bearing in mind the foregoing directions of the higher court, we proceed to rule this case under the law of negligence, with the same safeguards that would be charged to a jury.

Of the shipments involved in these two suits as the cause of the alleged damage after reaching Oklahoma, we find that there were approximately 704 cattle; 137 of them in four shipments, had been treated with arsenic dip and inspections before an interstate journey to Oklahoma; four shipments of 567 cattle were treated with oil and inspections before the interstate trip to Oklahoma.

The negligence claimed by the plaintiffs, in both testimony and argument, centers around the alleged condition of the dipping vat, the oil, the alleged evaporation thereof of the gasoline content, the failure to use an hydrometer, the dipping in the oil at all, since it is claimed that that had been abandoned, failure to have a drain barrel into which the dripping of the solution would run from the dripping pen and before it returned to the dipping vat; the failure to remove the scum from the top of the dipping solution; alleged faulty inspection; the meaning and wording of the certificates; the alleged cleanliness of the pastures into which the Fort Worth shipments were taken, and the subsequent appearance of ticks in those pastures, and in no other pastures; and what has been called a contract between the United States and Oklahoma as to the shipment of cattle from tick-infested regions into Oklahoma: It might be well to speak of that first.

The testimony shows that there were ticky regions in Oklahoma, and that what is called the contract between the two sovereignties was, in truth, a systematic attempt by both sovereignties to destroy the tick.

The testimony shows that the vats in which the cattle were dipped were of approved make; sufficiently long and deep, and wide, to insure complete immersion of the cattle. That, in addition to the physical properties of the vat, and the depth of the solution, men with poles were stationed on each side of the vat to submerge the head of any animal which, perchance, failed to be submerged as it entered and swam through the vat. If, by reason of any circumstance, such as wildness, or the placing of the head on the back of another steer, immersion of the head was not complete, that such head was, in fact, afterward treated with the solution from a bucket which was available. This was a rarity, however.

I might stop here to say there were a few witnesses introduced by the plaintiffs who had a remarkable similarity with reference to the percentages that they thought might have placed their head upon the back of a steer, and therefore could not be immersed, and that ranged from two to three in one hundred; it was so remarkable that the court places little credence in it.

The solution that came from the arsenic tank came by gravity into the vat and was used to keep the vat from five and a half to

six and a half feet deep in the solution, and the solution was properly tested and those depths would swim the animal.

The certificates show that the cattle had been dipped in Beaumont oil, if oil were used as the solution; the initials, "B. O." so meaning. It is sometimes called "insecticide." That oil was the approved oil for such purpose, and it had been so approved because its use had proven its effectiveness. The oil used in this particular case was purchased, some eight thousand gallons at a time, and placed in a storage tank, which was covered, and which was largely underground and which was adjacent to the vat, and a pump was used to place the oil from the tank into the vat, and this was done at such periods to insure the depth of the oil to be from five and a half to six and a half feet, which would insure the swimming of the animal. Such oil had not lost its efficacy by exposure.

The superintendent in charge of the dipping at the Fort Worth stockyards had the vat cleaned out prior to the dipping in the spring of 1919, and only had it refilled for the use of these particular shipments and others. Oil dipping was requested by these shipper plaintiffs, after authorization from headquarters in Washington.

That any scum which would interfere with effective dipping was not permitted to remain on the solution, but was scraped off on the morning of each day dipping was engaged in.

That oil was permited to be used in this manner when the owners or their agents requested its use, and it was also permitted under the regulations of the state of Oklahoma, into which state these cattle went.

An hydrometer which would show the specific gravity was only necessary if, and when, the oil had not, itself, demonstrated its effectiveness, and it was not required by any regulations of the Fort Worth Bureau.

The cattle were dipped in arsenic and oil at the Fort Worth stockyards under the inspection of the government officials, under regulations, and not under bulletins, because such shipments were for interstate only.

The drain barrel was not a practical method for the getting of the oil that dripped onto the dripping pen floor, back into the vat.

The inspections appear to have been careful and effective. They took place both

before and after dipping, and within the time after the dipping that the regulations provided.

The welfare of the oil-dipped cattle required a shed to· protect them from the sun, but such shed was not supported by any walls, and was a mere shed without walls. The shed merely being over the pen and some ten or twelve feet from the ground. If it happened to be a dark, cloudy day, and inspections were necessary, and there was not sufficient light' in the shed pen, then the cattle were taken out into the alley over which there was no shed. If the cattle were so wild or so congregating as to make personal inspection ineffective, or unsatifying, the gate of the pen was unlocked and they were taken out as required, and, if necessary, roped, or placed behind the gate for the inspection. Sometimes segregation was used.

There were ticky cattle in Carter County, Oklahoma, in the year 1919. Fences in that county were down because of oil activity. That county was from eight to twelve miles distant from the pastures of the ·plaintiffs in this cause. There was also a shipment of several hundred ticky cattle from Arkansas in March, 1919, by Biffle to ·the same Oklahoma pastures. These cattle he had dipped twice after reaching Oklahoma.

Stephens County had been a ticky county, but was cleaned in 1915 or 1916.

Jefferson County, Oklahoma, was a ticky county, but had been cleaned about the same time as Stephens, and was placed above the quarantine line in 1918.

The 100 pens which held approximately 25 to 30 cattle each were adjacent or contiguous to, or in the immediate neighborhood of, the two dipping vats. The cattle approached the vat from the pen, and into a chute which narrowed so that at the point of its mouth it was wide enough only for one animal. At that point there was 'a gate which raised and lowered by weight and pulley. This gate could be closed or opened, at the will of the operator, to admit or lessen the number admitted into the vat.

After swimming through the vat, the animal emerged into a small pen which would hold 25 or 30, which had a concrete floor sloped so that the drippings from the cattle drained back through a pipe into the dipping vat.

From the dripping 'pen, the cattle went to holding pens which were of the size heretofore indicated. If the animal was dipped in oil it was held for forty-eight hours, after which time there was an inspection for shipment, if found to be free of ticks. If dipped in arsenic solution, seven days elapsed between the first and second dipping, and also a number of days between the second and subsequent dipping, so that dipping in the oil enabled an earlier shipping, and a lessening of the expense to the owner of the cattle.

The cattle shipped from Fort Worth, in this case, were Texas cattle, purchased in or brought to Fort Worth by the shipper plaintiffs, who are residents of Oklahoma.

After the purchase in Fort Worth, they had them dipped in oil, if requested, or arsenic, and then placed in Oklahoma pastures. It was in the Oklahoma pastures that ticks appeared upon some of them.

The pens immediately adjacent to and connected with the two dipping vats in which were, respectively, oil and arsenic solution, numbered about 100. Each of these pens held approximately 25 to 30 cattle. These pens were kept locked, and when the inspectors desired to inspect, or to have the cattle out for any particular reason, an attendant of the stockyards had to be called to unlock the lock to that particular pen. These pens were numbered and the ones that were to be dipped on a particular day, were noted on a sheet of paper which passed from the office to the stockyard's hands who were charged with carrying out such operation. The operation and inspections were under the direction of the government agents, O'Brien, Owens, Hamilton and Randall, during the season we are investigating. If the dip were arsenic, that solution was tested and proper depth arranged before the word was given for the dipping. If it was oil, they· also gave word when the dipping should begin.

The witnesses introduced for the plaintiffs, in each of these consolidated causes with reference to the dipping and inspection at Fort Worth, knew nothing about such processes in so far as the particular cattle in these cases are concerned. They testified to instances that came under their observation while they were there, either casually, or for short periods while engaged in that and other duties. Some of them have evidenced their desire to be rather willing witnesses and when weighed in the balances of credibility, fall far short of the standard which challenges respect.

Many of the witnesses introduced by the defendant, were laborers or officials of the Fort Worth stockyards during the season of 1919. Their duties often included the assisting with, or the witnessing of dipping and inspection. They, like the witnesses introduced by the plaintiff, do not recall particular shipments, nor do they testify with reference to the cattle involved in this litigation.

Other witnesses introduced by the defendant, who were government officials, and whose duty it was to engage in an inspection and supervise the dippings, testify positively as to complete immersion and correct inspection during the year in which these cattle were treated. At least one of those witnesses has a memorandum book which he kept during that time, and in it are notations showing his participation in the dipping and inspection of some of the identical cattle involved here. These officials are still connected with the government in highly important positions where their integrity and efficacy may not be underestimated.

11,400 cattle were dipped at the Fort Worth stockyards -in April and May of 1919, for interstate shipment.

Ticky cattle, entering a clean pasture where there are clean cattle, will infect the clean cattle in about thirty days, if in the spring or summer of the year. This time lengthens from thirty up to ninety days, and, perhaps, more in the colder seasons of the year.

Only the female tick is contagious, and it must drop from the infected steer to the ground, and reproduce itself in many little ticks, which family attaches itself to the cattle when the animal gets close enough, either as the animal lays down, or as it passes through grass. The scratching chute was not known until 1923, several years after these shipments.

Ticks do not pass from animal to animal. Ticks may be carried by horses and mules as well as by cattle.

In finding above that the shipper-owners, plaintiffs, requested dipping in oil, such finding does not refer to the plaintiffs who were not concerned in the shippings out of Fort Worth.

The cattle that were shipped from Fort Worth and pastured in Oklahoma, with other cattle, were all quarantined in the latter part of July and the first days of August, 1919.

It is quite apparent that negligence is not proven, within the definition of that word, and it also necessarily follows that judgment must go for the defendant, in each of the cases making up this consolidated cause.