## THORNTON ET AL. *v.* UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE
FIFTH CIRCUIT.

No. 255. Argued April 20, 1926.—Decided June 1, 1926.

1. Regulations of the Secretary of Agriculture issued pursuant to statute are noticed judicially. P. 418.
2. Under the Acts governing the subject, it is not essential to the validity of regulations of the Secretary of Agriculture respecting live stock diseases that the regulations be certified to, or accepted by, the State. P. 422.
3. An indictment for conspiracy to commit the offense, under § 62 of the Penal Code, of interfering with and assaulting agents of the Bureau of Animal Industry while discharging their duties in supervising and causing the dipping of cattle to prevent the spread of a contagious disease, and charging the use of deadly weapons, need not allege that the cattle dipped were subject-matter of interstate

commerce, that they had come under the supervision or control of the Secretary of Agriculture, or that the agents were working to prevent the disease from spreading from one State to another. P. 423.

4. Congress has power, (as in the Animal Industry Act and subsequent legislation,) to provide measures for quarantining and disinfecting cattle in a State to prevent spread of disease to other States.   P. 424.

5. The ranging of cattle across a state line is interstate commerce, as well as driving them across, or transporting them by rail.  P. 425.

6. Spread of disease from State to State by ranging cattle is a burden on interstate commerce which Congress may prevent.  *Id.*

2 Fed. (2d) 561, affirmed.

CERTIORARI to a judgment of the Circuit Court of Appeals affirming a conviction in the District Court for conspiracy to violate § 62 of the Penal Code.

*Mr. Lee W. Branch,* with whom *Messrs. E. K. Wilcox, John W. Bennett,* and *Omer W. Franklin* were on the brief, for petitioners.

Section 3 of the Animal Industry Act, when read in the light of the entire statute, plainly has as its purpose coöperation with the state authorities on the part of the Bureau of Animal Industry in an advisory way, insofar as the work of extirpating the cattle tick from domestic animals is concerned.

If, by the Act of May 29, 1884, establishing the Bureau of Animal Industry, it was the intention of Congress to confer upon the Secretary of Agriculture authority to send agents and employees of the Bureau into the borders of any State in the Union and empower them to supervise the dipping and by compulsion and force cause domestic cattle to be dipped, the Act must be held unconstitutional and void.  *Kidd* v. *Pearson,* 128 U. S. 1; *United States* v. *Boyer,* 85 Fed. 425; *Covington Bridge Co.* v. *Kentucky,* 154 U. S. 210; *The Daniel Ball,* 10 Wall. 557; *Coe* v. *Errol,* 116 U. S. 517; *In re Greene,* 52 Fed. 113; *Gibbons* v. *Ogden,* 9 Wheat. 1; *Shafer* v. *Farmers*

*Grain Co.,* 268 U. S. 189; *Ills. Cent. R. Co.* v. *McKendree,* 203 U. S. 514; *United States* v. *Shauver,* 214 Fed. 154; *United States* v. *McCullagh,* 221 Fed. 288; *Howard* v. *Ills. Cent. R. Co.,* 207 U. S. 463; *Robertson* v. *Memphis R. Co.,* 109 U. S. 3; *Butts* v. *Merchants & Miners Trans. Co.,* 230 U. S. 125; *Hill* v. *Wallace,* 259 U. S. 44. The Act itself, properly construed, does not give to such employees any authority to enforce the disinfection and quarantine measures, except where animals are subjects of interstate commerce. *United States* v. *Gibson,* 47 Fed. 833.

The allegations of the indictment were not sufficient to bring it within the provisions of the Act of May 29, 1884. *Abby Dodge* v. *United States,* 223 U. S. 166; *United States* v. *Birdsall,* 195 Fed. 980; *United States* v. *Baird,* 48 Fed. 554; *United States* v. *Pittoto,* 267 Fed. 603; *United States* v. *Hallowell,* 271 Fed. 795; *United States* v. *Page,* 277 Fed. 459.

*Mr. Gardner P. Lloyd,* Special Assistant to the Attorney General, with whom *Solicitor General Mitchell* was on the brief, for the United States.

If the employees of the Bureau of Animal Industry named in the indictment were performing any duty legally imposed upon them pursuant to the federal statutes, the conspiracy alleged in the indictment and established by the evidence was a conspiracy to violate § 62 of the criminal code, whether or not they were also performing other work beyond the scope of their federal duties. *Ex parte Yarbrough,* 110 U. S. 651; *In re Coy,* 127 U. S. 731; *Ex parte Siebold,* 100 U. S. 371; *Ex parte Clarke,* 100 U. S. 399. Under the rule expressed in the above cases, there can be no doubt that the federal government may use, in the performance of its functions, persons who are also engaged in performing duties for a State. Some portion, at least, of the work performed by the employees of the

Bureau of Animal Industry was authorized by the federal statutes.    *M. K. & T. Ry.* v. *Haber,* 169 U. S. 613; *Reid* v. *Colorado,* 187 U. S. 137; *Oregon-Wash. R. R. & Nav. Co.* v. *Washington,* 270 U. S. 87.

The power of Congress to regulate commerce includes power to quarantine areas where contagious diseases of cattle exist, to prohibit interstate movements of cattle from such areas, and to authorize the supervision of dipping of cattle in such areas by federal agents.    *United States* v. *Ferger,* 250 U. S. 199; *Stafford* v. *Wallace,* 258 U. S. 495; *I. C. C.* v. *Goodrich Tr. Co.,* 224 U. S. 194; *California* v. *Pacific R. R. Co,* 127 U S. 1; *Luxton* v. *North River Bridge Co.,* 153 U. S. 525; *United States* v. *Gettysburg Elec. Ry.,* 160 U. S. 668; *Massachusetts* v. *Mellon,* 262 U. S. 447.

The indictment is valid.    *Stokes* v. *United States,* 157 U. S. 187; *United States* v. *Rabinowich,* 238 U. S. 78; *Williamson* v. *United States,* 207 U. S. 425; *Wolf* v. *United States,* 283 Fed. 885; *Foster* v. *United States,* 256 Fed. 207; *Ledbetter* v. *United States,* 170 U. S. 606; *Connors* v .*United States,* 158 U. S. 408; *Armour Packing Co.* v. *United States,* 209 U. S. 56; Rev. Stats. § 1025.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This case comes here by certiorari from the Circuit Court of Appeals of the Fifth Circuit.    267 U. S. 589. The judgment is one of conviction of the petitioners under an indictment found in the District Court for the Southern District of Georgia, charging the petitioners and sixteen others with the crime of conspiracy under § 37 of the Criminal Code to commit the offense against the United States denounced in § 62 of the same Code.    Section 62 punishes anyone who shall assault or interfere with an employee of the Bureau of Animal Industry of the Agricultural Department in the execution of his

duties or on account of his execution of them, and who shall use a deadly weapon in resisting any such employee in such execution.   The indictment was demurred to and the demurrer was overruled.   The defendants were tried and found guilty.   On writ of error the Circuit Court of Appeals affirmed the judgment.   2 Fed. (2d) 561.

The first count of the indictment charged that the defendants conspired to deter and prevent certain employees of the Bureau of Animal Industry from discharging their duties in supervising the dipping of, and causing to be dipped, cattle in order to prevent the spread of splenetic fever among them, and to eradicate the cattle fever tick, and that for this purpose the defendants used deadly weapons and killed one such employee and wounded others, all in the county of Echols, Georgia.   The second count charged that the conspiracy was directed not only to the use of force against the employees themselves but also to the dynamiting of spray pens and dipping vats used by such employees in their duties in causing the dipping of the cattle and the supervision thereof.

Under the Act of May 29, 1884, 23 Stat. 31, c. 60, a Bureau of Animal Industry was organized in the Department of Agriculture.   It is made the duty of the Bureau, by § 1, to investigate and report upon the condition of the domestic animals, their protection and use, to inquire into and report the causes of contagious, infectious and communicable diseases among them, and to collect information on the subject.   By § 2 it is authorized to employ experts.   By § 3, it is made the duty of the Commissioner of Agriculture to prepare such rules and regulations as may be deemed necessary for the supervision and effective suppression and extirpation of such diseases, and to certify such rules and regulations to the executive authorities of each state and territory, and invite them to coöperate in the execution and enforcement of the Act. Whenever the plans and methods are accepted by any

state or territory, in which such diseases are declared to exist, and the state or territory has adopted plans and methods for the suppression and extirpation of the diseases, and those plans shall be accepted by the Commissioner of Agriculture, and whenever a governor or other properly constituted authority of a state signifies his readiness to coöperate for the extinction of such disease in conformity with the Act, the Commissioner is authorized to expend so much of the money appropriated as may be necessary in such investigation and in such disinfection and quarantine measures as may be necessary to prevent the spread of the disease from one territory or state into another.

By an Act of February 9, 1889, 25 Stat. 659, c. 122, the Department of Agriculture was made an executive department of the Government under a Secretary of Agriculture, who was vested with all the authority conferred by the Act of May 29, 1884, *supra,* on the Commissioner of Agriculture.   By Act of February 2, 1903, 32 Stat. 791, c. 349, the Secretary of Agriculture was authorized and directed from time to time to make regulations concerning the exportation and transportation of live stock from any place within the United States where he had reason to believe a contagious cattle disease existed into and through any other state or territory as he might deem necessary, and all such rules and regulations were to have the force of law.   Whenever any inspector or assistant inspector of the Bureau of Animal Industry issued a certificate showing that the officer had inspected any cattle or other live stock to be transported from one locality to another and had found them free from Texas or splenetic fever infection or other disease, it was provided that the cattle might be shipped, driven or transported from one state or territory to another without further inspection, but that such animals should at all times be under the control and supervision of the Bureau for the purposes of

such inspection, and that the Secretary might make regulations to prevent the introduction or dissemination of contagion from one state to another.

By Act of March 3, 1905, 33 Stat. 1264, c. 1496, the Secretary is authorized and directed to quarantine any state or territory, or any portion of any state or territory, when he shall determine the fact that cattle or other live stock therein are affected with any communicable disease. Section 2 of that Act prohibits the transportation, delivery for transportation, or driving on foot, from any quarantined state or territory into any other state or territory, cattle or live stock except as provided in the Act. Sections 3 and 4 give the Secretary authority to make rules and regulations for the inspection, disinfection, certification, treatment, handling and method and manner of delivery and shipment of cattle or other live stock from a quarantined state into any other state when the public safety will permit, but prohibits such movement in manner or method or under conditions other than those prescribed by the Secretary.

Under date of June 15, 1916, various regulations were issued by the Secretary of Agriculture. They are not printed in the record, but they are matters of which we may take judicial notice. *Caha* v. *United States,* 152 U. S. 211. Under the regulations, when the Secretary determines that cattle in any state or territory are affected with a contagious disease, and he thinks a quarantine should be established, a rule is to be issued giving notice of the fact, to forbid the interstate movement of live stock from the quarantined area to be prescribed. Regulation 2 provides that cattle of the quarantined area exposed to or infested with ticks, which have been properly dipped twice with a certain solution and in the proper way under the supervision of an inspector of the Bureau, may be moved interstate for any purpose when the inspector certifies them to be free of infection from

splenetic fever; provided that the conditions are such that the cattle may be moved to the free area without exposure to infection.  The cattle are to be accompanied by a statement of dipping by the inspector supervising the same at the point of origin, and showing the ownership of the cattle, etc.; and cattle located in areas where tick eradication is being conducted in coöperation with the state authorities, and which are on premises known by the Bureau of Inspection to be free from ticks, may upon inspection and certification at a suitable season by a bureau inspector be moved interstate for any purpose without dipping.  One rule issued by the Secretary of Agriculture shows a description of the areas quarantined, which included Echols County, Georgia.

The evidence for the Government at the trial showed that Echols County, where this conspiracy was formed and the overt acts took place, was on the line between Georgia and Florida; that cattle ranged between one state and the other in that region; that the Department of Agriculture had quarantined in interstate transportation the cattle coming from Echols County because of the presence of the cattle tick among them; that under the Act an agreement had been made between the Secretary of Agriculture and the Georgia authorities acting under a Georgia statute, by which the regulations of the Secretary had been accepted as guidance for the state employees engaged in attempting to suppress the disease by requiring tick infested cattle to be dipped; that spray pens and dipping vats had been erected in Echols County at the expense of the United States, to carry out the duties of the Bureau of Animal Industry; that the state law authorized and directed the county and state officers to enforce the dipping of cattle in the counties which were tick infested, by process served in the name of the State, and that the state officers served such processes upon cattle-owners in the county; that the cattle which were

thoroughly dipped were marked with indelible paint; that United States inspectors were not always present at the dipping, but usually supervised what was done to gain a knowledge of what the state officers were doing in enforcing the state law, so that if successful the quarantine against cattle for shipment out of Georgia against Echols County could be discontinued; that this was only one instance of the investigations required under the Act of 1884 by the Bureau of Animal Industry employees to help cattle movements from the southern States to the north in promotion of interstate commerce; that it was while these activities of the employees of the Federal Bureau were progressing that the defendants and others, residents of Echols County, owners of cattle and neighbors, resenting the necessity for dipping, dynamited the spray pens and the dipping vats and assaulted the United States employees of the Bureau, wounded several and killed one by gun shot.

The first objection to the conviction is based on the indictment in that it contains no allegation that the regulations of the Secretary of Agriculture for the suppression and extirpation of the disease among live stock have been certified to the executive authority of the State of Georgia and accepted. The legality and validity of the action of the Secretary of Agriculture and the Bureau of Animal Industry in preventing the spread of disease from one state to another do not depend upon the consent of the state authorities. In the broad provisions of the legislation we have quoted, the authority of the Secretary of Agriculture to direct the employees of the Bureau of Animal Industry to engage in quarantine measures and the inspection of animals suspected of or known to have communicable diseases, is not limited to cases in which there is coöperation between the United States and the state authorities in the suppression of the spread of disease among cattle, the one as between states and the other as

within a state.  In order to make the action of both more
effective, they may coöperate so that their respective
purposes may be more effectively carried out, but the
power of each to act in its field does not depend upon the
consent of the other.  Therefore it is that such an aver-
ment as that suggested by the defendants' objection would
be superfluous for the indictment of the federal crime,
although it would be quite relevant in evidence as one of
the circumstances to explain what happened.

It is next objected that there were no allegations in the
indictment that the cattle being dipped were the subject
matter of interstate commerce or had in any way under
the law become subject to the supervision or control of the
Secretary of Agriculture, or that what the employees were
doing was to prevent the spread of communicable dis-
ease among the cattle from one state to another.  The
charge is of a conspiracy to commit the offense of an
assault upon employees of the Bureau of Animal Indus-
try, to prevent the execution of their duties as such, and
does not charge the substantive offense itself.  The rules
of criminal pleading do not require the same degree of
detail in an indictment for conspiracy in stating the object
of the conspiracy as if it were one charging the substan-
tive offense.  *Williamson* v. *United States,* 207 U. S. 425,
447; *Wolf* v. *United States,* 283 Fed. 885; *Foster* v.
*United States,* 256 Fed. 207.  Compare *Ledbetter* v.
*United States,* 170 U. S. 606, 612; *Connors* v. *United
States,* 158 U. S. 408, 411; *Armour Packing Co.* v. *United
States,* 209 U. S. 56, 84.

The assaults upon the employees of the Bureau of
Animal Industry and the interference with their duties
were described in the indictment as having to do with the
inspection of suspected cattle and the supervision of their
dipping.  As their duties in connection with suspected
and diseased cattle were described in the statute as im-
posed for the purpose of preventing the spread of con-

tagious cattle disease from one state to another, it is suffi-
cient certainty to a common intent to describe generally
that they were performing their duties under the statute
in the supervision and dipping of cattle, without further
definition.

It is finally urged against this conviction that the stat-
ute of 1884, *supra,* is unconstitutional in that. Congress
had no power to make it a duty of a federal employee to
dip cattle and suppress disease among .cattle within a
State; that such power is vested in the Legislature of the
State under the reservations of the Tenth Amendment
to the Federal Constitution; and that such legislation by
Congress can not be sustained as. a regulation of inter-
state commerce, because it is not confined to interstate
commerce and the cattle treated were not in interstate
commerce.

It is very evident from the Act of 1884 and the subse-
quent legislation and the regulations issued under them
that everything authorized to be done was expressly in-
tended to prevent the spread of disease from one State to
another by contagion, which of course means by the pas-
sage of diseased cattle from one state to another. This
is interstate commerce. The quarantine provided for was
to stop and regulate such interstate commerce until it
could be safely carried on. Not until suitable inspection
by the federal authorities. and treatment prescribed for
dipping of the cattle could the cattle be certainly rid of
the ticks' and splenetic fever and prevented from being a
dangerous source of contagion in the state into which
they were going. The duties of the employees of the Bu-
reau of Animal Industry here interfered with were all
part of the measure of quarantine reasonably adapted to
prevent the spread of contagion in and by interstate
commerce.

The requirement of dipping was a reasonable condi-
tion of allowing cattle from a suspected district to pass

into another state, and the provision of dipping vats and other means of complying with this requirement in a border county by the United States, and the supervision of such dipping by federal employees and, indeed, the dipping itself by them, were conveniences promoting interstate commerce where quarantine was necessary. There is no evidence that federal employees took part in enforcing dipping of all cattle of the county. That was done by state officers under the state law.

But it is said that these cattle do not appear to have been intended to be transported by rail or boat from one state to another and this only is interstate commerce in cattle under the Constitution. They were on the line between the two States. To drive them across the line would be interstate commerce, and the Act of 1905 expressly prohibits driving them on foot when carrying contagion. It is argued, however, that when the cattle only range across the line between the States and are not transported or driven, their passage is not interstate commerce. We do not think that such passage by ranging can be differentiated from interstate commerce. It is intercourse between states, made possible by the failure of owners to restrict their ranging and is due, therefore, to the will of their owners.

More than this, it is established by *United States* v. *Ferger,* 250 U. S. 199, that the authority of Congress over interstate commerce extends to dealing with and preventing burdens to that commerce and the spread of disease from one state to another by such cattle ranging would clearly be such a burden, if it were not to be regarded as commerce itself, and is therefore properly within the congressional inhibition. *Stafford* v. *Wallace,* 258 U. S. 495.

*Judgment affirmed.*