Jack James **PEDERSEN**, Appellant,

v.

**Ezra Taft BENSON**, Secretary of Agriculture, Appellee.

No. 13909.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 26, 1957.

Decided Feb. 13, 1958.

Mr. Ernest C. Tucker, Washington, D. C., for appellant.

Mr. Harry T. Alexander, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Lewis Carroll, Asst. U. S. Atty., were on the brief, for appellee.

Before DANAHER, BASTIAN and BURGER, Circuit Judges.

DANAHER, Circuit Judge.

An agent of one Demmer, as owner, received from the Secretary a permit to import five giraffes from Kenya, East Africa. After a period of detention at the Government quarantine station in New Jersey, three of the giraffes were sold and released to public zoos in various places in the United States, and two female giraffes were sold to one Freeman, but were not released. Appellant, intending to exhibit the giraffes at his private zoo, "Africa U. S. A." in Boca Raton, Florida, purchased Freeman's interest. One giraffe died of a heart attack, and appellant, after futile efforts before the Department of Agriculture, filed action in the District Court seeking release of the other. His complaint having been dismissed after hearings, this appeal followed.

▉ There is no error in the refusal to impanel a three-judge court to consider appellant's attack on the constitutionality of the statute, a question first raised in appellant's application filed after the adverse judgment.[1] The case

had gone forward on appellant's motion for preliminary injunction, and it was stipulated that the result of the hearings would be treated as a final disposition on the merits. Accordingly, we address ourselves to the issues raised before the District Judge.

Dr. L. C. Heemstra, as Acting Chief of the Animal Inspection and Quarantine Branch of the Department of Agriculture, had transmitted to the importing agent a permit for importation of the giraffes with a covering letter dated July 30, 1956, from which we quote:

> "This permit is issued with the further understanding that following completion of quarantine * * the giraffes will be consigned to an *approved zoological park* under *acceptable* governmental control." (Emphasis supplied.)

The Government tells us that the Secretary's administrative judgment was exercised adversely to the appellant because his privately owned zoo, "Africa U. S. A.," lacks "acceptable governmental control, not being responsible to the city, county or state. The Secretary would release the giraffe to appellant if he had affirmative governmental supervision * * *." Again, the Secretary asserts that "the condition in the permit constituted * * * an *ad hoc* evaluation that the Department of Agriculture makes in each case upon application for a permit." It is said that the Secretary "fears the giraffe although free from disease, may be a potential carrier of the much dreaded foot and mouth" disease.[2] Appellant argues that the Secretary's refusal to release his property is arbitrary, and that the condition in the permit is null and void in that neither

1. Pigott v. Detroit, Toledo & Ironton Railroad Co., 6 Cir., 1955, 221 F.2d 736, 742, certiorari denied, 1955, 350 U.S. 833, 76 S.Ct. 68, 100 L.Ed. 743; cf. International Ladies' Garment Workers' Union v. Donnelly Garment Co., 1938, 304 U.S. 243, 250, 58 S.Ct. 875, 82 L.Ed. 1316; Keyes v. Madsen, 1949, 86 U.S.App.D.C. 24, 179 F.2d 40, certiorari denied, 1950, 339 U.S. 928, 70 S.Ct. 628, 94 L.Ed.

1349; Citizens Protective League v. Clark, 1946, 81 U.S.App.D.C. 116, 155 F.2d 290, certiorari denied, 1946, 329 U.S. 787, 67 S.Ct. 354, 91 L.Ed. 674.

2. Pursuant to regulation, he had already determined that such disease existed in various countries, including East Africa. See 9 C.F.R. § 94.1 (1949); cf. 9 C.F.R. § 94.1(4) (Supp.1957).

statute nor regulation authorizes any such restrictive condition.

Giraffes are "ruminants" as defined by departmental regulation.[3] The importation of ruminants which are diseased or infected is prohibited.[4] Clearly the Department has not found that the five imported giraffes were infected or had been so exposed, for their importation was expressly permitted. Moreover, Dr. Heemstra's letter transmitting the permit recites that veterinary officials in Kenya had issued the proper certificate of their health. Presumably careful inspection thereafter was made as required,[5] indeed three of the giraffes were actually released to public zoos. How they can have been any less potential carriers than our subject animal is not suggested. In addition, the inspector in charge at the New Jersey quarantine station certified as of December 14, 1956, that the imported giraffes, held in quarantine "for technical reasons," were "in excellent health." It would seem, then, that all requirements of the statute as to the importation and quarantine of the animals had been fully met. The Secretary really does not contend otherwise. He points to no portion of the Act of August 30, 1890,[6] which authorizes regulations providing for conditioned importation. If the animals are infected, their importation is prohibited. If they have been exposed to infection so as to be dangerous to other animals, they shall then either be placed in quarantine or dealt with according to the regulations of the Secretary. If they have been exposed to infection but not infected, they may be slaughtered and their value shall be ascertained and paid to the owner. Certainly the applicability of such regulations as the Act authorizes must depend upon findings upon which, as the facts in the case require, either a prosecution may go forward or the valuation of slaughtered animals is to be determined.[7] No regulations under this Act are shown to have been violated here. On the contrary, the animal is in excellent health and would be released tomorrow to an "approved" zoo.

The regulations say nothing whatever about what is an "approved" park or what may constitute "acceptable" governmental control. Such terminology appears only in Dr. Heemstra's letter to the importer. He testified in aid of the District Court's understanding that such conditions reflect the Department's "policy"—itself undefined.

Asked how long he had been acting chief of the division in which capacity he might determine what permit would issue or not issue, Dr. Heemstra replied: "I have assumed these responsibilities and have been responsible for such work for about five years, since 1952 * * *."[8] In the past, no inspection had been made and there was no requirement that an applicant set forth any specified qualifications for a permit. Rather, it appears the officials consulted a publication of a private organization "Zoos and Aquariums" which lists the names of the zoos, the director of each, those who assist in obtaining animals, "and the type of governmental supervision—by and large whether it is municipal, state, or federal government." Another such

3. 9 C.F.R. § 92.1(f) (Supp.1957): "All animals which chew the cud * * *."

4. 21 U.S.C.A. § 104 (1952).

5. 21 U.S.C.A. § 105. See Act of August 30, 1890, 26 Stat. 416, §§ 6–10, inclusive, which make no provision whatever for conditional importation of ruminants or for the issuance of regulations authorizing a permit system of import control.

6. Now embodied in pertinent part in 21 U.S.C.A. §§ 101–105 (1952).

7. Cf. United States v. Grimaud, 1911, 220 U.S. 506, 521, 31 S.Ct. 480, 55 L.Ed. 563, where the Court sustained regulations relating to matters clearly indicated and authorized by Congress. "The Secretary * * * could not make rules and regulations for any and every purpose." Id., 220 U.S. at page 522, 31 S.Ct. at page 485.

8. Quotations here, and hereinafter are from testimony of Dr. Heemstra, unless otherwise indicated.

reference work in evidence was the privately sponsored "Zoological Parks, Aquariums and Botanical Gardens," edition of 1932 which "describes the zoo, the extent of it, the number of animals, and something about its methods of operation." Thus in considering an application for a permit, the Department considered "the facts detailed in the application itself and these two publications." The Department would not have issued the permit had it been known that the animal was ultimately to go to "Africa U. S. A.," a privately-owned and operated institution. No zoo owned by a private individual is permitted to import wild ruminants.

We may note that an "approved" zoo is one which Dr. Heemstra approves. A zoo under "acceptable" governmental control is one the control of which is deemed by him to be acceptable. The next succeeding chief of division may have entirely different ideas of what his tests shall be. No standards are specified by statute or by regulation. No criteria are available to guide a purchaser. There is no prohibition against the sale by a public zoo of an imported animal later exhibited by its purchaser. If any such zoo having been permitted to import a giraffe later sold it privately, "This particular zoo, of course, would then no longer be eligible to receive imported animals." The traffic in such imported animals may rest entirely in the hands of the director of an "eligible" zoo. Thus, a "public" zoo may import an animal at a particular price and sell it at an enhanced price, without let or hindrance, except the possible sanction of non-eligibility for future permits, depending upon the unregulated discretion of the bureau chief.

Such revelations impelled the trial judge to suggest an inspection of appellant's zoo, which was made by Dr. Heemstra, accompanied by Dr. Reed, acting director of the National Zoological Park in Washington, D. C. and Dr. Applewhite, federal veterinarian in charge of the Department's disease control activities in Florida. All concurred in Dr. Heemstra's report, from which we quote their "Conclusions: Based upon the inspection of 'Africa, USA' on January 22, 1957, *it is my conclusion that physical facilities and methods of maintaining animals at 'Africa, USA' are substantially equivalent to those of public zoos.*" [9]

Dr. Heemstra testified that "Private and public veterinarians all report to the state and federal authorities any diseased condition which in their opinion is dangerous and which is determined to be a contagious and infectious disease, a reportable disease," and that appellant's zoo meets all qualifications except for "governmental control." This latter aspect, it was explained, permits the Department to "feel" that a public zoo is under "a body which has a sense of public responsibility for the general welfare, which may not be inherent in a private zoo." If there were "irregularities which had occurred or which were about to occur, we would be in a position to deal with what we believe to be a responsible public body in bringing this to their attention and instituting corrective measures."

There is no evidence that the owners of a private zoo or circus are any less anxious to preserve their investment than some political body. There is no suggestion that the appellant's veterinarian is any less competent, because

---

9. The report also included the following: "Veterinary service, when needed is provided by Dr. J. A. Owen who maintains a practice in Boca Raton. *Dr. Owen is an Ohio State graduate and is accredited by Agricultural Research Service for the inspection, testing and certification of livestock for export and for interstate movement.* Dr. Owen is 'on call' rather than on a retainer or contract basis for such services as are necessary. In interviewing Dr. Owen he stated that he was fully aware of his responsibility in the reporting of suspected cases of communicable diseases to State and Federal livestock sanitary officials."

he is subject to call than an "eligible" zoo's veterinarian "on a retainer basis." On the contrary, Dr. Heemstra reported that appellant's veterinarian, when interviewed, advised "he was fully aware of his responsibility."

The situation, as it seems to us, was summed up by the Florida State Veterinarian, Dr. Campbell:

> "Frankly, I feel that if foreign ruminant animals constitute a danger or threat to our domestic animal or livestock industry, the importation of such animals should be prohibited. If, in the opinion of the Department of Agriculture specialists, the possibility is but assumed to be remote that such animals are carriers and that the public interest would be served by allowing the importation of these animals, then the Department of Agriculture—which allows such importations—should accept the responsibility of providing what it considers to be adequate veterinary supervision."

■ There can be no question of the ultimate objective voiced by the Department or of the desirability of regulation essential to its attainment. But we perceive no basis, and none has been demonstrated, upon which a government officer may impose an *ad hoc* system of licensure upon any citizen, or upon any one group as compared with another. If the law in the public interest, reflecting the policy of Congress, had prescribed that no ruminant may be imported except by a publicly owned zoo which meets prescribed conditions, generally applicable, that is one thing. But here importation was specifically permitted as to a shipment of animals, all alike. Any one animal was as much a potential carrier of hoof and mouth disease as the appellant's giraffe. If appellant's animal, or appellant's zoo,

had failed to meet standards "prescribed by an agency of government authorized to prescribe such standards," [10] again we would have had a very different problem. Here we find no regulations, no prescribed standards, no proscription by statute or otherwise, governing this appellant's purchase after expiration of the required quarantine period.

■ But, the Secretary argues, looking to the Act of February 2, 1903,[11] section 2 [12] here applies. Thus the Secretary is authorized to "make such regulations and take such measures as he may deem proper to prevent the introduction or dissemination of the contagion of any contagious, infectious, or communicable disease of animals from a foreign country into the United States or from one State * * * to another * * *." Section 1 of the Act deals with "the exportation and transportation of livestock from any place within the United States where he may have reason to believe such diseases may exist into and through any State * * * and to foreign countries." 21 U.S.C.A. § 120.

The Act of 1903

"is a measure intended to enable the Secretary to prevent the spread of disease among cattle and other livestock. He is authorized and directed from time to time to establish such rules and regulations concerning interstate transportation from any place 'where he may have reason to believe such diseases may exist * * * and all such rules and regulations shall have the force of law.' 'Whenever any inspector or assistant inspector of the Bureau of Animal Industry shall issue a certificate showing that such officer had inspected any cattle * * * which were about to be shipped * * * from such locality * * * and had

10. Securities and Exchange Commission v. Chenery Corp., 1943, 318 U.S. 80, 92–93, 63 S.Ct. 454, 461, 87 L.Ed. 626.

11. 32 Stat. 791.

12. 32 Stat. 792, and see 21 U.S.C.A. § 111 (1952).

found them free from \* \* \* communicable disease, such animals, so inspected and certified, may be shipped, driven, or transported from such place' in interstate commerce 'without further inspection or the exaction of fees of any kind, except such as may at any time be ordered or exacted by the Secretary of Agriculture. \* \* \* ' " [13]

We have no doubt whatever that the Secretary in aid of the objective of the Act may validly issue regulations governing the interstate transportation of animals *from any place where communicable disease exists or where he may have reason to believe it exists.* Appropriate regulations and the Secretary's order in their aid may even extend to the hides of slaughtered animals.[14] He may quarantine a state or any portion of it when he determines that cattle or other livestock therein are affected with any communicable disease,[15] and may issue valid regulations to effectuate the statutory intention. But he must issue them only in accordance with prescribed standards —he may not "exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable \* \* \* " [16] and "they are valid only as subordinate rules and when found to be within the framework of the policy which the Legislature has sufficiently defined." [17]

Here the Secretary's regulations are silent as to "approved" zoos or "acceptable" governmental control. His regulations [18] provide for a permit in two sections [19] and health certificate,[20] both of which were here complied with. The Secretary may not by his regulations alter or amend a law; he may merely regulate the mode of making effective what Congress has enacted.[21] Congress has nowhere said that a wild ruminant may be imported for exhibition purposes only by a public zoo. Congress has never said that such an animal when allowed importation may not be sold to a private zoo. There is no regulation to any such effect. There is no regulation which says such an animal may be exhibited only in an "approved" zoo operated under "acceptable" governmental authority. There is no regulation which confers upon the Secretary or the Chief of the Bureau of Animal Husbandry the authority to prescribe what zoo may purchase and exhibit a ruminant, the importation of which has been permitted as according otherwise with all proper requirements.[22]

13. Mintz v. Baldwin, 1933, 289 U.S. 346, 350–351, 53 S.Ct. 611, 613, 77 L.Ed. 1245. and see Mintz v. Baldwin, D.C.N.Y. 1933, 2 F.Supp. 700.

14. United States v. Pennsylvania Co., D.C. Pa.1916, 235 F. 961.

15. Thornton v. United States, 1926, 271 U.S. 414, 420, 46 S.Ct. 585, 70 L.Ed. 1013.
   There is no suggestion here that foot and mouth disease exists or is believed to exist in New Jersey.

16. Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, 537–538, 55 S.Ct. 837, 846, 79 L.Ed. 1570.

17. Panama Refining Co. v. Ryan, 1935, 293 U.S. 388, 429, 55 S.Ct. 241, 252, 79 L.Ed. 446.

18. See 9 C.F.R. §§ 92.1–92.29 (1949); cf. 9 C.F.R. §§ 92.11–92.40 (Supp.1957).

19. 9 C.F.R. § 92.4 (1949).

20. Id. § 92.5.

21. Morrill v. Jones, 1882, 106 U.S. 466, 1 S.Ct. 423, 27 L.Ed. 267; "Congress was willing to admit duty free all animals specially imported for breeding purposes. The secretary thought this privilege should be confined to such animals as were adapted to the improvement of breeds already in the United States. In our opinion, the object of the secretary could only be accomplished by an amendment of the law. That is not the office of a treasury regulation." Id., 106 U.S. at page 467, 1 S.Ct. at page 424.

22. Above all, neither the Secretary nor the Chief of the Bureau of Animal Husbandry may act without warrant of law. Cf. Morgan v. United States, 1938, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129; Morgan v. United States, 1936, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288.

It follows that the appellant had the right to purchase the animal, and, it would seem, should now be entitled to its release.[23] We do not envision a decree which commands the exercise by the Secretary of such discretion as may otherwise be reposed in him. We preclude simply his denial of release of the animal on the grounds we have decided are arbitrary.[24]

Reversed.

BASTIAN, Circuit Judge (dissenting).

I regret that I cannot agree to the reversal of the judgment in this case, even though I agree in principle with all that my brother DANAHER has written as to the dangers of executive power unguided by congressional expression.

In this case, however, I do not believe the appellant is in position to complain. The license was not issued to him but to Demmer, who, so far as the record discloses, was satisfied with the permit as issued. Three of the five giraffes were disposed of in accordance with the permit. Two were sold to Freeman, who in turn sold them to Pedersen. One giraffe has since died.

The time to have protested in court was by direct attack on the condition annexed to the permit when the permit was issued. This was not done, so far as the record before us discloses. Pedersen seeks the advantage of the permit without its burden. He must have known of —or should have known of—the condition when he purchased the two animals. In my opinion, he is not in position to complain. I would affirm on that ground alone.

---

23. Even knowledge of the unauthorize., discriminatory and unpublished (5 U.S. C.A. § 1002 (1952)) "conditions" does not invalidate appellant's purchase of the animal to defeat his right. See 5 U.S.C.A. § 1001(f) (2) and 5 U.S.C.A. § 1008(a) (1952).

24. Cf. Perkins v. Elg, 1939, 307 U.S. 325, 350, 59 S.Ct. 884, 83 L.Ed. 1320.