BORDAS & CO., Plaintiff and Appellant, *v.* SECRETARY OF AGRICULTURE, Defendant and Appellee.

No. 254. Decided February 28, 1963.

*M. Orraca Torres* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Nilita Vientós Gastón, Assistant Solicitor General,* for appellee.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

In compliance with their official duties two officers of the Department of Agriculture of Puerto Rico made sworn statements before a judge of the Court of First Instance stating the following:

(a) That through pier number 9 of San Juan, plaintiff introduced into Puerto Rico 260 bags of raw coffee coming from New York, giving accurate details of the date of importation, of the bill of lading, number of trip, name of ship, and name of the exporting firm and its address.

(b) That said coffee was introduced by plaintiff in violation of Act No. 35 of May 11, 1934, 5 L.P.R.A. §§ 581–589, and in violation of the order known as Plant Quarantine No. 4, 5 R.&R.P.R. § 581–4, issued by the Secretary of Agriculture of Puerto Rico under the authority of the aforesaid Act No. 35.

(c) That notwithstanding the fact that an officer of the Department of Agriculture ordered the retention of said coffee shipment at the pier, plaintiff removed it to another place in Puerto Rico.

By virtue of a search warrant issued by a magistrate, the aforesaid officers seized 121 bags of coffee, the same remaining at a warehouse under the custody of the Department of Agriculture. The defendant alleges that plaintiff disposed of the remaining bags of coffee which were not found.

Plaintiff filed a petition in the Superior Court for a declaratory judgment requesting the court to decide: "(a) That plaintiff is the owner of the seized coffee; (b) that Act No. 35 of May 11, 1934 and Quarantine No. 4 promulgated by the Department of Agriculture and Commerce of Puerto Rico under the authority of said Act is unconstitutional by application to the above-entitled case, because it is a matter regulated exclusively by the 'Plant Quarantine Act' of August 20, 1912, and the aforesaid Quarantine No. 73; (c) that defendants are morally and legally estopped from confiscating said coffee; (d) that defendants should immediately deliver to plaintiff the aforesaid product; and (e) that defendants be ordered to pay costs and attorney's fees."

Defendant appeared and alleged in his answer, in brief, that he acted under the Special Act on Importation of Coffee from Infected Areas, Act No. 184 of May 11, 1938, 5 L.P.R.A. §§ 610–612, and under the General Plant Quarantine Act, Act No. 35 of May 11, 1935, 5 L.P.R.A. §§ 581–589; that he confiscated the coffee because it was without the required certificate of inspection, 5 L.P.R.A. § 581 (Act No. 35), and because it came from a country which imports coffee from countries where the insect Stephanoderes Coffeae exists, which introduction constitutes a danger to the agriculture in Puerto Rico, 5 L.P.R.A. § 610 (Act No. 184). He denied that this matter was regulated exclusively by the Federal Government and stated that the aforesaid federal provisions are not contrary nor invalidate the local laws in the matter.

Plaintiff also alleged in his complaint that the introduction of that coffee was made with the consent of the Department of Agriculture of Puerto Rico, which assertion was expressly denied by the defendant in his answer and stated, on the contrary, that the Department objected to said introduction, which has given rise to this suit.

As new matter defendant alleged in his answer:

(1) That "plaintiff provoked this situation and prevented the Secretary of Agriculture from exercising his discretion as to the manner of disposing of the coffee seized by disobeying the order of retention of the coffee and removing it from the pier in express violation of the order issued by the respondent officer."

(2) That "plaintiff in open violation of the order of retention of the Secretary of Agriculture moved the coffee to his warehouse leaving on the pier only 9 bags. That when the Department of Agriculture became aware that the bags had been removed from the pier it sent inspectors to the Bordas Warehouses and found that of the bags removed plaintiff had disposed of 130 bags the whereabouts of which is still unknown to the defendant notwithstanding the steps he has taken to find out."

(3) That "upon making the inspection there only remained 121 bags which were identified as part of the lot withheld. That the Secretary of Agriculture again ordered plaintiff to withhold the bags of coffee which still remained in his warehouse until new order, to which Mr. Bordas agreed. That notwithstanding this new order of the Secretary of Agriculture, Mr. Bordas tried to remove the coffee to the Betancourt Torrefacción on January 28, 1957, which fact was not accomplished because the Department of Agriculture had the place under surveillance and could prevent it since the Betancourt firm upon learning that the coffee had been detained by order of the Secretary of Agriculture refused to accept it. That on this same date the search warrant was obtained to place the coffee under custody."

On September 21, 1959 the Superior Court rendered a lengthy order in favor of defendant, holding, in synthesis, that the federal and the local regulations were not conflicting, but rather concurring and complementary, that defendant had acted under the authority of the law, that the coffee should not be returned to the plaintiff, and that defendant was compelled to dispose of the coffee in harmony with the provisions of the law.

On the 25th of the same month of September 1959, plaintiff filed a motion requesting the court to enlarge its order by making it more explicit as to the authority of defendant to dispose of the coffee; it stated that it had evidence that the

coffee is not infected and also required defendant to roast the coffee at the expense of plaintiff and to return it to plaintiff. On the 16th of the following month (October 1959), plaintiff filed another motion asking leave to introduce evidence on the allegations of the complaint and of the previous motion. Five days later, on October 21, 1959, plaintiff filed a petition for review in the Supreme Court of Puerto Rico (Review No. 223) assigning four errors essentially the same as those assigned in this petition, which we shall copy below. On November 20, 1959 the Supreme Court refused to issue the writ of review sought at that time.

On November 25, 1959 plaintiff filed in the Superior Court another motion requesting the court to decide all the questions in controversy raised in the case. On the 30th of that month of November 1959 the Superior Court entered judgment in which it held (1) that the defendant acted under the authority of law, (2) that defendant can not deliver the coffee to the plaintiff and that he is bound to retain it in order to dispose of it in accordance with the law, (3) that in acting in the manner it did the plaintiff forfeited its right to dispose freely of the coffee pursuant to Act No. 184 and Act No. 35, and (4) that the judgment disposed of all the questions raised by plaintiff in its petition for declaratory judgment.

Plaintiff appeals to this Court and assigns as error: (1) "In holding that defendant was compelled by express provision of Act No. 35 of May 11, 1934 to act in the manner he did"; (2) "In holding that pursuant to the legal provisions defendant can not deliver the coffee to plaintiff and that he is bound, on the contrary, to withhold it in order to dispose of it in any manner provided by law"; (3) "In deciding that in acting in the manner it did plaintiff forfeited its right to dispose freely of the coffee, pursuant to the provisions of Act No. 184 of May 11, 1938 and Act No. 35 of 1934"; (4) "In failing to hold a hearing on the merits, giving appellant an

opportunity to offer evidence with respect to the allegations of the complaint, rendering judgment dismissing the complaint."

In referring to the second error appellant alleges in its memorandum before us that "this error is practically discussed in the former" and adds one paragraph; and in referring to the third error it does not discuss it because it says, "this error has been discussed in the previous assignment."

Really, the question raised by appellant is that the Secretary of Agriculture of Puerto Rico acted illegally because, in its opinion, the laws of Puerto Rico do not authorize him to confiscate the coffee in question and because those laws of Puerto Rico on the subject matter, it maintains, are unconstitutional because they are in conflict with the federal legislation which covers the matter exclusively. To that effect it says in its memorandum: "Our contention is that Act No. 35 of May 11, 1934 is superseded by Federal Act No. 20, approved in 1912, and by Quarantine No. 73 which have absolute control of the importation of raw coffee into Puerto Rico, for which reason respondent is not bound to act in the way it did, and not even entitled to do so."

We must first decide whether the Secretary of Agriculture and his agents acted within the law, since if they acted wrongfully under the laws of Puerto Rico, we would have to decide in favor of appellant and there would be no need of considering the constitutionality of those laws. It is well known that the validity of the laws is presumed, *People* v. *Pérez*, 83 P.R.R. 518, 523 (1961), and that the courts shall not pass on the constitutionality of said laws, unless it becomes necessary in order to decide the case before them, *Commonwealth* v. *Aguayo*, 80 P.R.R. 534, 576–581 (1958); *Ashwander* v. *Tennessee*, 297 U.S. 288, 346 (1935). If the defendant acted legally in the discharge of his duties or in the exercise of the powers granted to him by the laws of Puerto Rico, we shall consider the constitutional validity of the afore-

said acts and if they are valid, we shall then see whether the trial court committed any error warranting the reversal of its judgment.[1]

## I

The purpose of Act No. 35 of May 11, 1934, 5 L.P.R.A. §§ 581–589, is "to prevent the introduction into Puerto Rico of agents causing plants diseases, of insects or other plant pests ... [and] control plant pests and diseases of plants in Puerto Rico." Sess. Laws of 1934, p. 298. Said Act (citations are from 5 L.P.R.A.) provides:

"Section 581. No tree, shrub, or seed thereof, nor any other plant ... *without a certificate* signed by a government entomologist or phytopathologist or by the person having the power required in the State, territory, or district from which the importation comes, setting forth that the said articles are apparently free from diseases or insects harmful to plants.

"All importations of plants or plant material authorized under the provisions of sections 581–589 of this title shall arrive free from sand, soil, or earth, except such material as is packed in sterilized soil which has been inspected at the ports of the Continent; *It being understood,* That said material shall be accompanied by a notice of shipment issued by the Department of Agriculture of the United States, and in its original container, and shall be inspected by a duly authorized agent of the Secretary of Agriculture and Commerce. This notice of shipment shall be required for shipments which have been sent to Puerto Rico immediately after being inspected on the Continent by the Federal Bureau of Plant Quarantine; *Provided,* That for shipments which have been delivered to the local market on the

---

[1] Regarding judicial review, Professor James B. Thayer has indicated in his excellent article entitled "The Origin and Scope of the American Doctrine of Constitutional Law" published in 7 Harv. L. Rev. 129, that all courts should give due respect to the legislative expression, that is, democratic, condensed in one law, and citing the well-known professor and Judge Cooley, he says at p. 144: "One who is a member of a legislature may vote against a measure as being, in his judgment, unconstitutional; and, being subsequently placed on the bench, when this measure, having been passed by the legislature in spite of his opposition, comes before him judicially, may there find it his duty, although he has in no degree changed his opinion, to declare it constitutional."

Continent and have been later sent to Puerto Rico, a certificate of inspection signed by the representative of the Department of Agriculture of the state from where they have been reshipped shall be accepted." (Italics ours.)

Section 582 makes all the provisions of this Act applicable to experimental stations of the State and Federal Governments "when not in conflict with federal laws specifically applying to Puerto Rico."

Section 586 provides as follows:

"(a) No person ... shall bring into Puerto Rico from any other state, territory or district of the United States, any articles, animals or insects, the introduction of which is by sections 581–589 of this title made conditional, except in accordance with the conditions herein specified, and each consignment of such articles, animals, or insects, shall be fully described in the manifest, invoice, and bills of lading of the person, firm, corporation, or carrier transporting the same to Puerto Rico, which said description shall specify where the shipment was made, from whom such articles were received and to whom consigned.

"(b) Upon the arrival at any of the ports designated by section 583 of this title of any of the articles, animals or insects, the introduction of which is by sections 581–589 of this title made conditional, the person, firm, corporation, or carrier bringing them shall notify the Secretary of Agriculture and Commerce in writing of such arrival *and shall not dispose of the same until an inspector shall have investigated said articles and given written permission for their release.*

"(c) If a duly authorized inspector or other agent finds plants or their products or other articles subject to the provisions of any quarantine put into force as provided by sections 581–589 of this title, *in movement or which have been moved, or in possession of any person, in violation of sections 581–589 of this title or of any quarantine or regulation* prescribed under sections 581–589 of this title, he *is hereby authorized to seize said material and may destroy it* or otherwise dispose of it, or may order its immediate withdrawal from the Commonwealth or may order any procedure that he may deem necessary for the public interest. (Italics ours.)

Section 588, "in order to prevent the introduction into Puerto Rico ... of insects and plant diseases injurious to agriculture," authorizes the Secretary of Agriculture to prohibit or restrict the entry into Puerto Rico, or the movement within Puerto Rico of any plants or vegetable product capable of harboring such insects or diseases. This section authorizes the Secretary to promulgate "a quarantine restricting the entrance of the said described materials from the states, territories and districts mentioned, or their movement within Puerto Rico; specifying the restrictions imposed ... governing the entrance or movement." It also provides that the Secretary of Agriculture "is hereby authorized to promulgate all reasonable rules or regulations required by sections 581–589 of this title, and such rules and regulations shall have all the force and effect of [law]."

The purpose of Act No. 184 of May 11, 1938, 5 L.P.R.A. § § 610–612, is to "protect the coffee of Puerto Rico from pests existing in other countries." Sess. Laws of 1938, p. 368. Section 610 reads as follows:

"It shall be illegal to introduce into Puerto Rico any coffee plants, seeds or beans, or bags used for coffee, coming from the countries where the insect *Stephanoderes coffee,* exists, *or from any other country which shall have imported coffee plants, seeds or beans coming from the said countries; Provided,* That this prohibition does not include the roasted or ground coffee bean." (Italics ours.)

Section 612 authorizes the Secretary of Agriculture to promulgate the rules necessary to comply with Act No. 184.

In the exercise of the authority granted to the Secretary of Agriculture of Puerto Rico by Act No. 35 of 1934, the latter promulgated Quarantine No. 4, 5 R.&R.P.R. § 581–4, in which after stating that "coffee growing is one of the principal crops" of Puerto Rico;[2] that "there is danger of in-

---

[2] It still is. In his message to the Legislative Assembly on February 14, 1963, considering the situation of the country, the Governor

troducing new insect pests and diseases in or on the seed, plants and coffee products"; and that "the seeds necessary for planting purposes can be easily produced here"; it determines that "the introduction of coffee plants, seeds, or its not elaborated products is hereby prohibited from the United States and its Territories; Provided, That the introduction of roasted coffee will be permitted as stated in . . . Customs Tariff Act of 1930 and Acts Nos. 77 of May 5, 1931, and 7 of April 9, 1934 [13 L.P.R.A. § § 2201 to 2205]; and provided furthermore, that the introduction of coffee plants and seeds for experimental and propagation purposes by the Federal and Commonwealth Experimental Stations shall be permitted under the provisions of Act No. 35 of May 11, 1934 [5 L.P.R.A. § § 581 to 589]."

Said quarantine continues: "Any coffee plant or seed introduced into Puerto Rico in violation of these regulations will be re-exported or destroyed as may be ordered by the Secretary of Agriculture and Commerce.

"Any raw coffee introduced into the Island in violation of Act No. 77 of 1931, . . . to Act No. 35 of 1934 . . . and of this quarantine, if seized by the State or Federal authorities, shall be under the observation of the Plant Quarantine Section, which will order its roasting in Puerto Rico before its disposal."

 Confronted with these explicit legal provisions contained in Act No. 35 and Act No. 184, particularly the quoted § § 586 (c), 610 and 612 of 5 L.P.R.A., we must conclude that the Secretary of Agriculture and his agents acted under the authority of the local law. The problem, on this point, is not, as seems to understand the plaintiff in making its first assignment of error, whether the Secretary is *bound* to act in the manner he did. The problem is whether the

informed that "the coffee crop has been calculated in 350,000 hundredweights, the same as last year and about 90,000 more than in 1960." Text of the message published in El Mundo on February 16, 1963, p. 22.

Secretary is *authorized* or not by law to act as he did. The
roasting of confiscated coffee is mandatory only when the
Secretary allows its use in Puerto Rico. The reason is that
by roasting the coffee, a process which includes toasting and
grinding, all damaging insects or pests which the coffee may
carry are presumably killed. Act No. 35 expressly provides
that if an inspector finds plants or their products, subject
to the provisions of any quarantine put into effect by virtue
of said Act, in movement (said plants or their products) **or**
which have been moved illegally, said inspector *"is hereby
authorized to seize said material and may destroy it..."*
5 L.P.R.A. § 586 (c). The record does not reveal what action
the Secretary took on the coffee except confiscating it, for
which he was fully authorized.

## II

 The contention that Act No. 35 of 1934 is void be-
cause the subject matter is regulated exclusively by Congress
is not correct. History, case law, and even the Congressional
Act itself are adverse to said contention. In this field of
protection and development of agriculture both governments,
the state and the federal, have exercised and do exercise con-
current jurisdiction, and even more, it is of common knowl-
edge that they operate in mutual cooperation. An authorized
summary on this matter has been published in the chapter
concerning agriculture in the Report of the Commission on
Intergovernmental Relations submitted by said commission
to the President of the United States and sent by the latter
to Congress on June 28, 1955.[3] On the point in question said
Commission informed:

"The first United States Commissioner of Agriculture was
appointed by President Lincoln in 1862. In the same year,
National-State cooperation [in agricultural matters] began ...

---

[3] This commission was created by Public Law No. 109 of July 10, 1953
to study the relations between the Federal and State Governments. 67
Stat. 145; 68 Stat. 20; 69 Stat. 7.

Late in the 1800's, cooperative relationship began to evolve in the general area of commodity inspection, with both the National Government and the States beginning to police the movement of agricultural products through commercial channels. National activities were designed originally to prevent the entry into interstate commerce of products that might be injurious to animals, crops, or human health. The States undertook similar measures for intrastate commerce. The purposes and coverage of inspection and grading activities have steadily expanded over the years, as new pests and diseases have entered the country and as marketing and distribution systems have become more complex." Message from the President of the United States Transmitting the Final Report of the Commission on Intergovernmental Relations, 84th Cong., 1st Session, House Document No. 198, pp. 150–151.

For other studies on the matter, which maintain the foregoing view, you may see GAUS, "Agricultural Policy and Administration in the American Federal System," Ch. 15 of the book Federalism, Mature and Emergent, edited by Macmahon, Doubleday, N.Y. 1955,[4] and BOWIE & FRIEDRICH, Studies in Federalism 444–458 (1954).[5] For other examples of official cooperation between the state and the federal governments, see FREUND in the cited symposium Federalism, Mature and Emergent 162–163; and the same author and others in I Constitutional Law, Cases and Other Problems 748–750 and 760 (2d ed. 1961). In this and other fields of government the Anglo-Saxon politico-juridical genius has paved the way to the creation and development of functional and flexible institutions which evolve with the lapse of time. It would be naive to attempt to imprison in clear mental

---

[4] "Congress passed three important acts in 1862 that set a policy of national-state participation [in agricultural matters] that not only persists but also has been expanded to include local government units." GAUS, op. cit. at p. 283.

[5] "The overall problem of the relation between the state and federal governments and the independent initiative left to each depended on current needs... That this course was possible and reasonably successful is an indication of the capacity of the American federal system to meet the requirements of a dynamic economy." (BOWIE and FRIEDRICH, op. cit. at p. 444.

diagrams the alive and dynamic relations that exist, in continuous process of adaptation and readaptation, between the components of a great federal organization. Reality does not always come in the form that is most convenient for classification and interpretation.

 Two fundamental concepts of constitutional law come into play here. First in time and scope is the police power of the state and second, the vast power of the federal government to supervise interstate commerce. As is of common knowledge, every community politically organized has what we have called the police power of the state to protect the safety, the health, and the welfare of its inhabitants. Said power rested with the states prior to the drafting of the federal constitution; it was not delegated to the federal government and still resides in the states. *Brown* v. *Maryland*, 12 Wheaton 419, 442 (1827); *Barbier* v. *Connolly*, 113 U.S. 27, 31 (1885); WEAVER, Constitutional Law 491 (1946).[6] It is in the exercise of the police power that the states legislate to protect their agriculture, their cattle, their forests and their birds. *Savage* v. *Jones*, 225 U.S. 501, 525 (1912); *Miller* v. *Schoene*, 276 U.S. 272, 279–280 (1928); *Reid* v. *Colorado*, 187 U.S. 137 (1902); *Kelleher* v. *French*, 22 F.2d 341 (1927), *aff'd*, 278 U.S. 563 (1928); Annotation *"Validity of Statutes, Ordinances, or Regulations for Protection of Vegetation Against Disease or Infection,"* 70 A.L.R.2d 852 *et seq.;* particularly § § 2, 3, 21, and 22. Both jurisdictions, the state and the federal, cooperate to make more effective the struggle against the pests but the authority of one does not depend on the other, *Thornton* v. *United States*, 271 U.S. 414, 423 (1926).[7] To prevent or reduce the risk

---

[6] "The power ... is a branch of the police power, *which unquestionably remains, and ought to remain, with the states.*" (Italics ours.) Chief Justice Marshall, in *Brown* v. *Maryland*, 12 Wheaton at 442.

[7] "In order to make the action of both [State and Federal Governments] more effective, they may cooperate so that their respective purposes may be more effectively carried out, but the power of each to act in its field does not depend upon the consent of the other." 271 U.S. 423.

that these damaging diseases may spread to the crop and to the agriculture, it is necessary at times to injure or destroy private property, without compensation, *Miller* v. *Schoene, supra* at 280; *Kelleher* v. *French, supra* at 343. The exercise of police power does not become illegal or void because it incidentally affects the interstate commerce, *Savage* v. *Jones, supra* at 525; nor because it causes economical prejudices, *Texaco* v. *Secretary of Public Works,* 85 P.R.R. 686 (1962); *Goldblatt* v. *Town of Hempstead,* 369 U.S. 590, 592 (1961).

We shall now turn to examine the Quarantine Act of Congress and Quarantine No. 73 of the Secretary of Agriculture of the United States to see whether they are actually incompatible with Act No. 35 of Puerto Rico and Quarantine No. 4 of the Secretary of Agriculture of Puerto Rico. The pertinent provision of the federal act is very lengthy and it would not be practical to reproduce it here verbatim but we shall set forth briefly its pertinent content. The provision in question is § 8 of the aforesaid Quarantine Act of August 20, 1912, as amended, and its text may be read in 7 U.S.C.A. § 161.[8]

■ Said Plant Quarantine Act of Congress, 7 U.S.C. § 161, authorizes the Secretary of Agriculture of the United States to quarantine any state, or any portion thereof, when he shall determine that such quarantine is necessary to prevent the spread of a dangerous plant disease. It prohibits that any product specified in the notice of quarantine *be moved* from any quarantine state or place and transported into other states or places of the United States. It is obvious that the purpose of this provision is to provide a mechanism to prevent an infested area to spread to another one. It may be seen that Act No. 35 of Puerto Rico does not conflict with the federal act because it does not seek to permit what the federal Act prohibits, but rather both Acts are complementary

---

[8] In its formal aspect that section is an example of how laws should not be drafted; it consists of a single paragraph which fills two pages of U.S.C.A. and contains four "provided" clauses.

to each other. The Puerto Rico Act provides that in order to import plants or seeds to Puerto Rico they should have a certificate showing that they are free of pests by the corresponding authority of the state or place from which the products come. That is, in the absence of action by the Secretary of Agriculture of the United States, agriculture in Puerto Rico would be exposed to damage or destruction by pests imported with infested products if the law and the Secretary of Agriculture of Puerto Rico should be unable to prevent their importation. But Puerto Rico has the authority, and the duty, to protect its agriculture. This is a case, as we have previously noted upon examining the case law, of police power and the United States Supreme Court has declared that that power may be exercised even though it may incidentally affect interstate commerce, *Savage* v. *Jones, supra* at 525. And it is only natural that this be so; first there must exist agriculture in the different states in order that there may be interstate commerce of agricultural products.

At this stage of the discussion we must consider the incident of the *Oregon-Wash. Co.* v. *Washington*, 270 U.S. 87 (1926), on which appellant bases its brief. Upon considering a quarantine law of the state of Washington in the light of the federal quarantine law already cited, the court held that "it is impossible" to read the federal statute without "attributing to Congress the intention" to take over the care of the agriculture of the states (p. 99) and that therefore the state law could not subsist. The fact is that that was not the intention of Congress and said body hastened to assert so. The *Oregon-Wash.* case was decided on March 1, 1926 and on April 13 of that year Congress added to that § 8 of the Act, 44 Stat. 250, 7 U.S.C. § 161, its last three provided clauses by virtue of which it reinstated to the states its police power over the matter and overruled the aforesaid case.[9]

---

[9] "Formerly it was argued that common law was superior to legislation because it was customary and rested upon the consent of the governed. Today we recognize that the so-called custom is a custom of judi-

To that effect it was said in *Hinkle* v. *Railway Express Agency*, 6 So. 2d 417, 420 (1942) : "The purpose of the Congress in the enactment of the 1926 amendment was to reinvest the states with their police power. This is apparent from the express language contained in the last proviso of the amendment. The case of Oregon-Washington Railroad & Navigation Co. v. State of Washington ... decided prior to the amendment, is not applicable. Obviously, the amendment was enacted to meet this decision."

[9] But if it should be necessary, in order to better ascertain the intention of Congress, though it appears explicitly stated in the aforesaid amendment of 1926, reference may be had to the debates that took place in Congress when the aforesaid amendment was being considered. Congressman Jones stated the following: "A few weeks ago the Supreme Court ... held that these quarantine regulations of the different States were invalid, because the Federal Government had taken possession of the field under its power to regulate interstate commerce. The purpose of this measure is simply to permit the States to continue such regulations where they are not in conflict with the regulations of the United States Government or where the regulations of the United States Government do not cover the particular plant or thing which the State laws undertake to cover." Congressional Record-House, Vol. 67, Part 7, p. 7053 *in fine*.

Congressman Bankhead stated: "The effect of that decision [Oregon-Washington] was that the State authorities did not have the power to exercise any control whatever over the importation of infested sweet-potato seeds or plants from adjoining States which were coming into our own State and causing throughout the State great havoc in the sweet-

cial decision, not a custom of popular action. We recognize that legislation is the more truly democratic form of law-making. We see in legislation the more direct and accurate expression of the general will." POUND, "*Common Law and Legislation*," 21 Harv. L. Rev. 383, 406 (1908).

potato industry. This bill will correct the situation speedily..." Congressional Record, House, *ibid.*, p. 7054.

To the same effect see the statements of Congressmen Hill and Summers in the same volume at pp. 7056–7058. Naturally, when the facts of the case at bar arose, in 1959, the state of law was as above described because, as we have pointed out, the amendment to the federal law which set aside the case of Oregon-Washington, *supra*, was made in 1926 and the *Hinkle* case was decided in 1942.

 Within that situation of coexistence of the federal and the state regulations and the cooperation between both jurisdictions to get rid of pests and crop diseases as contemplated and made possible by the federal law, can it be said that Quarantine No. 4 of the Secretary of Agriculture conflicts with Quarantine No. 73 of the United States Secretary of Agriculture? They are not in conflict because both cover different situations. The United States Secretary of Agriculture having determined that there are in several countries a series of pests injurious to the coffee, forbade, by virtue of Quarantine No. 73, in the exercise of the authority vested on him by the aforesaid Plant Quarantine Act, 7 U.S.C. §§ 151–167, the importation into Puerto Rico of raw coffee coming from foreign countries. 7 C.F.R. § 319.73. Said quarantine does not protect Puerto Rico from infested raw coffee which may be imported from the United States. That protection is afforded by Quarantine No. 4 of the Secretary of Agriculture of Puerto Rico, promulgated under the authority granted to him by Act No. 35 of 1934. So that both regulations or quarantines are not in conflict, but they rather complement each other, and they may and do coexist. It would be paradoxical that Quarantine No. 73 which was promulgated to protect the Puerto Rican coffee be now used to leave it at the mercy of such a serious risk as that of the insect pest which Quarantine No. 73 as well as Quarantine No. 4 undertake to suppress: the "Stephanoderes coffeae." See text

524

of Quarantine No. 73 as drafted in 1940, 7 C.F.R., Supp. of 1940, § 319.73.

 It is not to be presumed that federal regulation substitutes the state regulation because of the fact that Congress regulates an area in a restricted fashion. For this to be so it is necessary that the Congressional enactment reasonably construed be in actual conflict with the state law, *Huron Portland Cement Co.* v. *Detroit*, 362 U.S. 440, 443 (1960); *People* v. *Burgos*, 75 P.R.R. 517, 528–29 (1953). In the absence of a specific prohibition in a federal act against a local act, the state legislation which complements the federal law is valid provided the former is not substantially in conflict with the latter, *Puerto Rico* v. *Shell Co.*, 302 U.S. 253 (1937); *Chabrán* v. *Bull Insular Line*, 69 P.R.R. 250, 272 (1948). The conflict should be so direct and positive that both laws can not be reconciled or coexist at the same time, *Kelly* v. *Washington*, 302 U.S. 1, 10 (1937). As we said in *Luce & Co.* v. *Minimum Wage Board*, 62 P.R.R. 431, 438 (1943): "In order that it can be maintained that the federal statute excludes an insular act which seeks to protect the health and welfare of the public, it is not enough that the two laws should embrace the same subject matter. It is required that the insular law by its own terms or in its practical administration be in conflict with the act of Congress or manifestly infringe the public policy of the federal statute."

 Precisely, on this matter of the protection of the coffee industry in Puerto Rico we may say that Congress has been liberal. It should be noted that on behalf of that industry Congress has delegated to the Government of Puerto Rico the function of levying import revenue. See 13 L.P.R.A. § 2201 *et seq;* the history appearing in the annotation to § 2201; and 19 U.S.C. § § 1319 and 1319(a).

The fourth error was not committed. The controversy did not consist in the condition of the coffee. It consisted in (1) whether the Secretary was authorized to confiscate the

coffee, and (2) whether Act No. 35 was valid. On these two points we have already expressed ourselves. See *Reid* v. *Colorado, supra*, where a conviction was upheld for importing into the state cattle in violation of the state law. It was not proved that the cattle had any disease. The Federal Supreme Court held that the question involved was that the cattle was imported without having been submitted to the inspection required by the state law, p. 140.

The judgment rendered by the Superior Court, San Juan Part, on November 30, 1959 will be affirmed.